Bristol-Myers Company, Appellant, *v.* Lit Brothers, Inc.

Argued May 25, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

82

*William N. Trinkle,* with him *Frank F. Truscott,* of *Truscott, Trinkle & Wright,* for appellant.

*Sylvan H. Hirsch,* with him *I. Jerome Stern* and *Sundheim, Folz & Sundheim,* for appellee.

*Joseph A. Keough,* for amici curiæ.

OPINION BY MR. JUSTICE MAXEY, June 19, 1939:

Plaintiff filed a bill in equity to restrain by injunction an alleged violation of section 2 of the Pennsylvania Fair Trade Act of June 5, 1935, P. L. 266 (73 PS secs. 7 and 8), on the ground that defendant issues yellow trading stamps, when requested, on all purchases of merchandise, including the trade-marked articles, Sal Hepatica and Ipana Tooth Paste, produced by plaintiff. The court below upheld the adjudication of the Chancellor and dismissed the bill. This appeal followed.

Section 2 of the Fair Trade Act provides: "Wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section one of this act, whether the person so advertising, offering for sale, or selling is, or is not, a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

Plaintiff contended that defendant violated section 2 of the Act in that it issued and delivered trading stamps as part of its retail sales of plaintiff's trade-marked products, these trading stamps being redeemable or exchangeable for premiums on articles of value and

being issued to purchasers of plaintiff's trade-marked commodities at a rate of one of such trading stamps for each 10 cents of purchase price of the commodity.

Defendant in its answer denied "any violation of the minimum resale price as averred by plaintiff, or any violation of the Fair Trade Act . . .," denied that "the issuance of trading stamps as averred, constitutes a discount, but on the contrary" averred that "the issuance of the trading stamps is solely for advertising purposes and in accordance with a long continued policy of the defendant so to do over a period of thirty years," and averred further that "the trading stamps . . . in and of themselves have no value, nor may the stamps issued in connection with the sales of Sal Hepatica and Ipana Tooth Paste, of themselves be redeemed for any article of value." Defendant further denied that "it has committed any unlawful acts which have resulted in inducing breaches of plaintiff's contracts with other retail dealers, or damage and destruction to plaintiff's system of doing business; or that said acts have deprived plaintiff of the benefit of the Fair Trade Act of Pennsylvania and of the Act of Congress; or that said acts have damaged plaintiff's trade-marks and good will."

The chancellor found, inter alia, the following facts: "That after defendant had notice . . . that plaintiff had entered into contracts with others fixing the resale price of plaintiff's products, it always sold Ipana Tooth Paste . . . and Sal Hepatica . . . at the resale prices fixed by plaintiff in contracts with others"; . . . "that the purpose of the issuance of trading stamps is to attract people into the store . . .; that before a customer can receive sufficient stamps to obtain anything, he must fill a book, and a book represents the purchase of $99.00 worth of merchandise . . .; that these stamps are redeemable only by the Yellow Trading Stamp Company"; that "they are not redeemable on defendant's premises" and defendant "has no connec-

tion with the . . . stamp company except its contractual relationship in respect to the . . . stamps"; that "defendant pays the . . . stamp company for stamps which are actually redeemed, at the rate of $1.40 per thousand stamps . . .; that if an injunction were granted in this case, it would have a very serious effect on the operation of defendant's business . . .;" that "there is no way that defendant could issue trading stamps only with merchandise not affected by the Fair Trade Act because this would necessitate an examination of one hundred thousand charge account bills a month, item for item, for the purpose of determining with which merchandise trading stamps could be given and that 533,000 to 600,000 items per month are billed to customers; that it would not be practically possible to examine all of the items on these bills in order to pick out the merchandise for which stamps could be given; that such a procedure would develop ill-will on the part of the customers . . .; that the cost of such an examination of charge account bills would be prohibitive . . .; that the trading stamps issued in connection with sales of plaintiff's products of themselves cannot be redeemed for any article of value"; that "such redemption can be made only after 990 of the stamps have been pasted in the stamp book furnished for that purpose"; and that "to obtain 990 stamps . . . it is necessary to purchase $99.00 of merchandise;" and "that no evidence was offered to show that defendant's competitors had suffered any damage, or that plaintiff's business had in any way been affected or threatened to be affected, or that its trademark had been or was about to be damaged, or that the public had been or was being misled."

The chancellor's conclusions of law are, inter alia: "That defendant's delivery of trading stamps upon request . . . is not in violation of the . . . Fair Trade Act; that trading stamps, when issued in good faith with all merchandise and not as a subterfuge for the

purpose of evading the Fair Trade Act, are a form of advertising in the same category as free delivery service" etc. . . .; "that the purpose of the . . . Fair Trade Act was to prevent predatory price cutting and 'loss leaders' and defendant's issuance of trading stamps is not within the purport of the Act; . . . that if defendant were enjoined from issuing trading stamps with plaintiff's products, it would compel defendant entirely to discontinue the issuance of trading stamps, one of the basic and long-established policies on which defendant's business has been founded, and that the advantage which might be obtained by plaintiff is slight as compared with the substantial damage which would be done to defendant; and that plaintiff has not presented any proof that it has either sustained or been threatened with any substantial or irreparable damage."

Briefs have also been filed by E. R. Squibb & Sons, and by the Lambert Pharmacal Company, each party being self-described as "one of those protected [by the Fair Trade Act]" and as "amicus curiæ."

The purpose of the Fair Trade Act is obvious, it being to prevent the cutting by any dealer, of the established price of any commodity identified by the trade-mark, brand or name of the producer. This price cutting which confers a slight pecuniary advantage to the buyer has nevertheless been adjudged by the lawmakers of forty states to be prejudicial to the public interest. Such price cutting forces, or at least prompts, other dealers to abandon the sale of the price-cut commodity, with the result that the producer of it suffers a loss of business which in turn leads to unemployment in his establishment. The abandonment of the sale of this price-cut commodity by many dealers means the narrowing to the public of opportunities to purchase it and if it is an article of merit, as it presumably is, the public interest is thereby affected adversely. Our state legislature by the enactment of the law now invoked has declared that it is the public policy of this Common-

wealth to stop this "cut-throat competition." Price cutting through "loss leaders," that is, by selling a certain commodity at less than cost in order to attract trade to the store where many other commodities, as well as the "loss leader" commodity, are sold, has come to be generally looked upon as unfair and predatory, and the prevention of such practices was the undoubted purpose of the Pennsylvania Fair Trade Act of 1935.

The purpose and scope of Fair Trade Acts are succinctly set forth by Mr. Justice SUTHERLAND, speaking for the United States Supreme Court in *Old Dearborn Distributing Co. v. Seagram Distillers Corp.*, 299 U. S. 183 (a case arising under the Fair Trade Act of the State of Illinois, with provisions similar to ours), as follows: "Generally speaking [state court decisions] sustain contracts standardizing the price at which 'identified' commodities subsequently might be sold, where the price standardization is primarily effected to protect the good will created or enlarged by the identifying mark or brand. Where a manufacturer puts out an article of general production identified by a special trademark or brand, the result of an agreement fixing the subsequent sales price affects competition between the identified articles alone, leaving competition between articles so identified by a given manufacturer and all other articles of like kind to have full play. In other words, such restraint upon competition as there may be is strictly limited to that portion of the entire product put out and plainly identified by a particular manufacturer or producer. . . . Appellants here acquired the commodity in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing assent to the

protective restriction, with consequent liability under section 2 of the law by which such acquisition was conditioned. . . . Here, the restriction, already imposed with the knowledge of appellants, ran with the acquisition and conditioned it. . . . Good will is a valuable contributing aid to business—sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will 'is entitled to protection as against one who attempts to deprive him of the benefits resulting from the same, by using his labels and trade-mark without his consent and authority.' *McLean v. Fleming,* 96 U. S. 245, 252, 24 L. Ed. 828, 831. 'Courts afford redress or relief upon the ground that a party has a valuable interest in the good-will of his trade or business, and in the trade-marks adopted to maintain and extend it.' *Hanover Star Mill Co. v. Metcalf,* 240 U. S. 403, 412, 60 L. ed. 713, 717, 36 S. Ct. 357. The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Sec. 2 of the Act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' See *Liberty Warehouse Co. v. Burley 'Tobacco Growers' Co-op. Marketing Asso.,* 276 U. S. 71, 91, 92, 96, 97, 72 L. Ed. 473, 480-483, 48 S. Ct. 291. . . . There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and

business of the producer and distributor of identified goods, but injurious to the general public as well."

The question before us is: Did the trade practice of the defendant amount to a violation of the Fair Trade Act and tend to defeat its purpose? The facts are not in dispute. They are that appellant entered into contracts with certain retailers in this state, of whom appellee was *not* one, whereby these retailers agreed not to resell these products except at the prices stipulated by appellant, namely, 39 cents for "Ipana Tooth Paste" and 25 cents for a small package of "Sal Hepatica." On October 22, 1937, appellant notified appellee that it had entered into such contracts in Pennsylvania and advised the appellee of the minimum resale prices fixed by these contracts. The appellee, although not a party to these contracts, nevertheless maintained the prices fixed by appellant on these commodities but did issue trading stamps with the sales of these commodities as it did (and has done for 30 years) with the sales of all its merchandise. The alleged violation of the Fair Trade Act consists *not* of the sale of the specified commodities for less than the prices fixed by the appellant, but in the issuing of trading stamps with these sales. The stamps issued are those of the Yellow Trading Stamp Company and are issued to the customer upon request. One stamp is issued with every purchase amounting to ten cents. These stamps are not redeemable until a book of 990 stamps have been acquired by purchases amounting to $99. For such a book, the customer receives from the Stamp Company a premium worth at retail $1.75. The appellee does not issue these trading stamps automatically with each 10 cent sale of commodities but only upon the request of the customer and when the bill is paid on time. The record reveals that on account of many customers not requesting stamps with their purchases, only 64% of the amount of stamps, which would have been issued by the appellee

in 1936, were in fact issued, and in 1937 this percentage was 63.

There is no doubt that the giving away of these stamps by Lit Brothers, Inc.,—its practice for 30 years—is not a price-cutting device but a means of inducing a customer to return to the store to make additional purchases so that he or she may accumulate 990 stamps paid for by purchases amounting to $99 and then upon the presentation to the Stamp Company of a book containing these 990 stamps, be given an article of merchandise worth at retail $1.75. For so doing the Stamp Company receives from Lit Brothers $1.40 when it presents the 990 stamps to the latter concern, for redemption. In other words, the customer qualifies himself to receive a bonus worth $1.75 when he has paid Lit Brothers $99 for purchases.

Instead of making it possible for a bonus of *merchandise* worth $1.75, to be secured by a customer spending $99 in their store, Lit Brothers might conceivably operate a plan whereby the customers who had paid them $99 for merchandise, would be given a dinner worth $1.75, or seven tickets for seven days parking of an automobile at the rate of 25 cents a day, or a theatre ticket costing $1.75, or ten gallons of gasoline to induce him to motor again to Lit Brothers' store. All these things would be things of *value* to the customer, but would such rewards of patronage constitute a "price-cutting" by Lit Brothers within the meaning of the Fair Trade Act, of "Sal Hepatica" and "Ipana Tooth Paste," which Lit Brothers admittedly sell along with thousands of other commodities?

While it is the purpose of the Fair Trade Act to prevent "cut-throat competition," it is *not* the purpose of the Act to prevent *all* business competition. Competition is still "the life of trade," and no public policy is sound which stifles the spirit of enterprise. If, for example, merchant A provides orchestral music for his customers at a certain hour of the day, or maintains

in his store a salon where works of art are exhibited, or a nursery where children are fed and otherwise cared for while their mothers are shopping in the store, or if he provides his customers free bus service to and from his store, merchant B has no grounds for complaint which the law will heed. Yet all these things confer benefits on the customer and some of these benefits are susceptible of pecuniary measurement. It follows, therefore, that for a merchant to confer pecuniary benefits upon his customers, which benefits some competing merchant does not confer, does not amount to such unfair competition as the Fair Trade Law forbids. Merchant A can extend his customers 30 or 60 days credit on the purchase of a commodity while merchant B refuses to extend any credit on the purchase of the same article. A is not thereby violating the Fair Trade Act. A may allow a discount of 1% on all bills paid within ten days after being rendered. B may allow no such discount. A is not thereby violating the Fair Trade Act.

It is clear to us that the practice indulged in by Lit Brothers, of issuing trading stamps with the sales of its merchandise falls within the sphere of legitimate competition and does not constitute a "selling [of] any commodity at less than the price stipulated" and that it is not "unfair competition" within the meaning of the act appellant invokes. To come within the prohibitions of the act, Lit Brothers would have to either (1) cut *directly* the price of the commodities within the act's protection, or (2) accomplish the same result in respect to the commodities by a device which was a palpable subterfuge resorted to for the purpose of circumventing the law. The law still, as Chief Justice SHAW said in *Com. v. Hunt*, 45 Mass. 111, "looks at truth and reality through whatever guise it may assume." What Lit Brothers did in this matter is neither a direct price-cutting of certain commodities nor is it a palpable subterfuge to conceal a law evasion. It is *not* a "guise" assumed to cloak "reality." The issuing

of trading stamps is and long has been a legitimate means of attracting customers to the store issuing them. It has not met with express legislative condemnation in this Commonwealth and there is nothing in the act invoked to indicate that its provisions were intended to prevent the practice.

There is also a time-honored maxim of the law which applies to this case, to wit: "De minimis non curat lex." As BROOM says in his "Legal Maxims": "Courts of justice generally do not take trifling and immaterial matters into account." In "The Reward," 2 Dods. Adm. R. 269, 270, Sir W. SCOTT observed that "the court is not bound to a strictness at once harsh and pedantic in the application of statutes. The law permits the qualification implied in the ancient maxim, de minimis non curat lex. Where there are irregularities of very slight consequence, it does not intend that the infliction of penalties should be inflexibly severe. If the deviation were a mere trifle, which, if continued in practice, would weigh little or nothing on the public interest, it might properly be overlooked."

If, for example, a customer spent $99 in Lit Brothers' store for the purchase of 396 tubes of "Ipana Tooth Paste (a supply adequate for a long lifetime) and upon the presentation to the Stamp Company of the 990 trading stamps he received with his purchase, he was given an article worth $1.75, he would be obtaining in the form of *merchandise* a discount of 1.76%. Applying this to each 25 cent purchase of tooth paste, it would amount to four and $\frac{4}{10}$ths mills on that purchase. When the further facts are considered that this "discount" is not in cash and that fewer than $\frac{2}{3}$rds of the purchasers of commodities at Lit Brothers' store ask for or accept trading stamps, the infraction charged appears to be still more trifling than above indicated.

President Judge OLIVER of the court below, sitting as chancellor in this case, appropriately said in his adjudication: "In this particular case the plaintiff has

failed to show that it either has sustained or will sustain any injury or damage as a result of defendant's continuing to issue trading stamps. In the language of one of the plaintiff's executive officers who testified on its behalf, the retail dealers who complained to the plaintiff merely stated that, if plaintiff did not stop the issuance of trading stamps by defendant, they 'would be forced to meet the competition.' . . . There was no evidence that any dealers had cancelled, or threatened to cancel, their contracts with plaintiff, or that they had refused to buy any further merchandise from the plaintiff, or that plaintiff had suffered any damage at all. . . . Even if such issuance of trading stamps did constitute a violation of the act, no injunction should be issued in the present case because the injury to the plaintiff, if any, is slight, whereas the damage to the defendant caused by a restraining order might well be substantial and irreparable—certainly out of all proportion to the benefits which the plaintiff might derive from the issuance of such order."

A suitor who seeks a decree which will do him no good but will work a hardship on another is not armed with a cause that will make any appeal to a court of equity. As this court said in *Reynolds v. Boland,* 202 Pa. 642, 647, 52 A. 19: "Equity springs from conscience and is administered through it." The Supreme Court of the United States expressed the same principle in *Deweese v. Reinhard,* 165 U. S. 386, as follows: "A court of equity acts only when and as conscience commands."
The decree is affirmed at appellant's cost.

DISSENTING OPINION BY MR. JUSTICE DREW:

In my opinion the decision of the majority legalizes a plain violation of the Fair Trade Act and opens the door to a multitude of carefully devised schemes to effectuate indirect price-cutting. The Act expressly prohibits the sale of a commodity at a price less than that stipulated in any contract entered into pursuant to the

provisions of the Act, and it seems to me that a sale of goods accompanied by trading stamps is a sale at a reduced price in violation of this statutory provision. The undisputed facts show, and the court below found, that the trading stamps are redeemable for other merchandise or may be sold to others by the purchaser to whom they have been issued. The giving of the trading stamps is an integral part of the transaction of sale of the particular trade-marked commodity. When a customer purchases a tube of appellant's tooth paste for 39 cents he does not pay 39 cents for the tooth paste alone, but for the trade-marked commodity and the trading stamp. Since the trading stamp represents a definite value redeemable in other merchandise, he is receiving for the stipulated price something of value in addition to the trade-marked commodity.

That this amounts to a rebate or discount upon the stipulated price is evident. The stamp books themselves bear the words: "Yellow trading stamps are not something for nothing but something instead of nothing —a discount for the money you spend with the storekeeper", and "Refusing to take yellow trading stamps from the storekeeper is like forgetting your change. Always ask for them." This language clearly shows that those who issue the stamps recognize the fact that one who purchases an article with which he receives trading stamps is obtaining the particular article at a price less than the one stipulated. The fact that the discount is in the form of a stamp redeemable in merchandise rather than in the form of a direct cash rebate which could be used to purchase the same merchandise is wholly immaterial.

The contention that giving such stamps is merely a form of advertising ignores the actual fact that the customer is receiving the article at the standard price less the value of the stamp, and is contrary to the judicial decisions of other courts which have dealt with the trading stamp problem. In *Rast v. Van Deman & Lewis*

*Co.*, 240 U. S. 342, the United States Supreme Court expressly ruled that giving trading stamps with the sale of merchandise could not be treated as a mere method of advertising, but on the contrary was "a method of giving discount, practically in some instances a rebate upon the price." See also *Sperry & Hutchinson Co. v. Hertzberg*, 69 N. J. Eq. 264.

While it is true that the Fair Trade Act is in derogation of the common law and is therefore to be strictly construed, it is equally true that an act is not to be construed to defeat the very purpose for which it was intended. In *Calvert Distillers Corp. v. Nussbaum Liquor Store*, 2 N. Y. S. (2d) 320, in interpreting the New York Fair Trade Act, the court said (p. 324) : "With the economic soundness or wisdom of the statute the courts are not concerned. It expresses a new business policy by the lawmaking body of the state. It is not to receive such a narrow or strict judicial construction as virtually to destroy its purpose. Rather it is to receive a judicial construction designed to carry out that new policy, to effectuate its primary purpose."

We must, therefore, consider the history of this fair trade legislation and examine the evils which it sought to alleviate. The Act deals not with a commodity alone, but with a commodity which is identified by a brand or trade-mark. Although the retailer owns the particular merchandise, he does not own the brand or trademark which identifies the product. The courts have long recognized that the goodwill which this mark symbolizes is property, and that this property—the ownership of the goodwill—remains in the manufacturer though he has parted with the commodity: *Old Dearborn Distributing Co. v. Seagram Distillers Corp.*, 299 U. S. 183. It is to protect this property interest by preventing retailers from capitalizing on the goodwill of the producer through price-cutting schemes that the Fair Trade Acts have been enacted: *Old Dearborn Distributing Co. v. Seagram Distillers Corp.*, supra; *Triner*

*Corp. v. McNeil,* 363 Ill. 559; *Weco Products Co. v. Reed Drug Co.,* 225 Wis. 474. In the first case cited the United States Supreme Court said (p. 193) : "The primary aim of the law is to protect the property— namely, the goodwill—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself."

The Act recognizes the fact that a manufacturer of a trade-marked commodity derives an advantage from a uniform price known to the buying public. When a manufacturer has through national advertising and a widespread sales program established a reputation as a producer of a Dollar Watch, *any* sale of that article at a less amount discredits the article in the eyes of the consumer and injures the goodwill which the manufacturer has created. Furthermore, price-cutting by one retailer forces other retailers in the same locality to cut prices to maintain the trade on that article. The retailer's margin of profit is thereby reduced to such an extent that he is ultimately forced to discontinue handling the particular commodity or at least to push the sales of competing products. The inevitable result is that the producer suffers from the loss of distributing outlets for his product.*

Since the Act is to be construed to effectuate its purpose and to remedy the existing evils, it is thus apparent that *any* sale which tends to produce these results is. to be condemned. The Act recognizes the fact that a retailer who sells a dollar article for 99 cents is. impairing the goodwill of the producer. It seems to me that a practice which would permit a retailer to sell a dollar article and 1 cent worth of trading stamps for $1 is just

---

* See: Haring, Retail Price Cutting and Its Control (1935); McLaughlin, Fair Trade Acts, 86 U. of Pa. L. R. 803; The Fair Trade Laws, 36 Columbia L. R. 293; Retail Price Maintenance, 45 Yale L. J. 672.

as objectionable. If the Act permits the retailer to give trading stamps redeemable in valuable merchandise, it also would of necessity sanction the giving of the merchandise itself with each sale of the trade-marked article. And since the customer is receiving for his dollar spent more than the trade-marked product, he realizes that he is receiving it for less than $1. If the maintenance of the manufacturer's goodwill requires that the consumer shall at all times associate the price of $1 with the particular brand, the goodwill is impaired where the consumer receives the trade-marked commodity plus a 1 cent article for $1 just as much as where the consumer pays 99 cents for the trade-marked product alone.

The argument that the giving of trading stamps is the same as providing "orchestral music for his customers at a certain hour of the day, or maintains in his store a salon where works of art are exhibited, or a nursery where children are fed and otherwise cared for while their mothers are shopping in the store" seems to me clearly unsound. Such services have no direct relation to the articles purchased or to the price paid; in fact one may receive these services even though no purchases are made. A direct reduction in the price of a trade-marked commodity injures the manufacturer's goodwill because there is a *direct association in the customer's mind between the price and the particular article*. Where the reduction takes the form of a trading stamp the value of which is directly proportional to the value of the article purchased, the same association exists since the customer realizes that he is getting the commodity at its standard price less the value of the trading stamp. The trade-name is discredited in the mind of the consumer just as much as if an actual cash rebate were given. But where the customer receives free parking or other similar services, he does not associate the receipt of these gratuities with the price of the particular article which he may purchase. There is

consequently no injury to the trade-name or the good-will of the manufacturer.

The majority opinion argues that even though appellee is violating the Act, it is not entitled to injunctive relief on the ground that the benefit to be obtained would be disproportionate to the damage done appellant. While it is true that the stamps now issued are not of great value, nevertheless the Act declares that *any* sale at less than the price stipulated is unfair competition. Although the stamp represents but a small proportion of the total purchase price of one particular article, the fact remains that it is a reduction in price and this court is not given the power to pass upon the extent of the reduction. That purchasers recognize these stamps as being valuable is established by the fact that appellee's customers requested over 146,000,000 stamps in 1937 and that 95% of these were redeemed. In passing on the question of damages in *Calvert Distillers Corp. v. Nussbaum Liquor Store,* supra, the court said (p. 325) : "The only practical method of securing any kind of enforcement of the statute as now drawn is by way of injunctive relief. To obtain such relief under the statute it is unnecessary, generally speaking, for the owner or producer to prove the actual damage sustained. It is sufficient to establish that there is in existence a 'good will' to be protected and the injury thereto will ordinarily be presumed if there is unlawful price cutting." Here there is what amounts to unlawful price-cutting. Hence appellee's contention that appellant has failed to establish irreparable damage is immaterial.

Furthermore, the majority ignores the real damage which appellant will suffer if relief is denied. To meet the competition other retailers will have to devise similar schemes for granting rebates. There would be nothing to prevent appellee or any other retailer from increasing the number of stamps issued with each purchase or the value of the merchandise that could be ob-

tained. The result would be an indirect price-cutting war with the same damaging results as those which arise out of direct price-cutting. Hence even though the particular violation here involved is not in itself causing immediate damage of serious proportions, the obvious consequences that will result from a denial of injunctive relief warrant the restraining of this practice.

The majority stresses the fact that appellee would have to discontinue the issuance of trading stamps and that this would be highly detrimental to its business. While it is true that equity will frequently refuse to grant an injunction where it will harm a defendant more than it will benefit a plaintiff, that principle can have no application here. The legal theory upon which section 2 of the Act is based is that selling below the stipulated price constitutes an interference with the producer's property rights which may properly be made tortious: *Old Dearborn Distributing Co. v. Seagram Distillers Corp.,* supra. In *Sullivan v. Steel Co.,* 208 Pa. 540, this court said (p. 555) : ". . . as to the principle invoked, that a chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction, it is enough to observe that it has no application where the act complained of is in itself as well as in its incidents tortious." The majority fails to consider that appellee bought appellant's goods for resale purposes with full knowledge of the price restriction and with full knowledge of the law which authorized that restriction. It was not obliged to buy, and as said by the United States Supreme Court in *Old Dearborn Distributing Co. v. Seagram Distillers Corp.,* supra, its "voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability under § No. 2 of the law by which such acquisition was conditioned." If the relief accorded by the Act is to be denied merely because it is

profitable for a retailer to violate its mandatory provisions, certainly the Act is rendered nugatory.

The court below stressed the fact that several states, whose original fair trade acts were similar to our own, passed subsequent legislation expressly prohibiting the use of trade stamps. From this fact it is argued that our Act as it now stands was not intended to include the practice of giving trading stamps. I cannot agree that the passage of such legislation manifests an ambiguity in the acts as originally drawn. On the contrary this action shows that the legislatures in those states in enacting fair trade laws had in mind the abolition of the very practice which the majority opinion sanctions. In order to make certain that the courts would not adopt an interpretation, as does the majority in this case, which defeats the very purpose of the legislation, those states saw fit to add a provision to clarify what some might have thought ambiguous and to insure an interpretation consistent with the ends which the legislatures sought to achieve. As said by Mr. Justice HOLMES in *United States v. Sischo,* 262 U. S. 165, 169: ". . . there is no canon against making explicit what is implied and adding a little emphasis to the endeavors to make the proposition broad." The Fair Trade Laws seek to prohibit *all* forms of price-cutting. Those legislatures which enacted amendments have precluded the courts of those states from interpreting their statutes in such a manner as to prevent the acts from having their intended effect. Such action should have had great weight in persuading this court to interpret our act to carry out its desired purpose.

I would therefore reverse the decree of the court below and enjoin appellee from continuing a practice which in my judgment constitutes a flagrant violation of the Fair Trade Act.

Mr. Chief Justice KEPHART joins in this dissent.