**COLGATE–PALMOLIVE COMPANY and
The Sperry & Hutchinson Company,
Intervenor, Plaintiffs,**

v.

**MAX DICHTER & SONS, Inc., et al.
Civ. A. No. 56–297.**

United States District Court
D. Massachusetts.

June 8, 1956.

Supplementary Opinion June 20, 1956.

Second Supplemental Opinion
July 12, 1956.

546

John F. Groden, Withington, Cross, Park & McCann, Boston, Mass., for plaintiff.

Samuel Lane, Casey, Lane & Mittendorf, New York City, Edward H. Bennett, Jr., Sullivan & Worcester, Boston, Mass., for intervener plaintiff.

Henry Gesmer, Boston, Mass., Marvin M. Geller, Boston, Mass., for Alric, Marrud, Di-Deb, Inc., Margolid and Rudnick.

Newton A. Lane, Boston, Mass., for Max Dichter & Sons.

ALDRICH, District Judge.

This is a suit by a manufacturer for an injunction against violation by non-signers of a Massachusetts fair trade agreement. Mass.G.L.(Ter.Ed.) c. 93, §§ 14A–D; General Electric Co. v. Kimball Jewelers, Mass.1956, 132 N.E.2d 652. While strictly the present proceeding is an application for a preliminary injunction, I declined to grant the injunction on affidavits and statements of counsel, and requested evidence which I hoped would be the same on this issue as that which the parties would offer on the merits. Counsel have so described the evidence now received.

I find diversity of citizenship; that the jurisdictional amount exists on the same basis as Judge Wyzanski's in Eastman Kodak Co. v. Lee-Wilson, Inc., D.C.D.Mass., 138 F.Supp. 591; that plaintiff has executed fair trade agreements with a number of Massachusetts retailers; that it is engaged in a business within the statute, and that it has long

published its fair trade prices to the defendants. I further find that the defendants [1] have consistently and wilfully sold below these prices. There is only one principal defense, namely, that the plaintiff, by reason of its failure to enforce against others, is not in a position to assert its rights against the defendants. The defendants contend that the plaintiff has not shown that it has pursued a vigorous campaign of enforcement. Whether such default be considered acquiescence, waiver, or unclean hands, I believe the burden is on the defendants, and not on the plaintiff. Regardless of where the burden lies, however, I am clear that there was no intentional waiver or acquiescence. To the extent that plaintiff's enforcement has been ineffective it was not because plaintiff wanted it that way. The more serious question is whether its enforcement has been reasonable and diligent, regardless of its intentions.

■ I find that even prior to the Massachusetts Fair Trade Law, hereinafter called the Act, plaintiff was an adherent an enforcer of price maintenance. It likes the Act, and top management believes it "never had it so good." Plaintiff's sales force is so indoctrinated, and I assume they believe it, too. Under these circumstances plaintiff feels that it is reasonable to rely primarily on its sales force, as distinguished from separate "police," to check on compliance at

the retail level. The sales force's comparatively frequent checking is supplemented by complaints from retailers when their competitors are violating, and by a Massachusetts association of druggists, which is a strong and active exponent of fair trade in the cosmetic field. Plaintiff finds that violations are only occasional, that many, proportionately, are only accidental and readily corrected, and that usually even intentional violators can be dissuaded. When these are not, suit is brought. I credit plaintiff's testimony, and its findings. Naturally, results are not perfect, but, especially considering the size of its operation, (2,500 outlets in Massachusetts alone,) absolute perfection cannot be expected. Apart from the matter of tolerating trading stamps and similar devices, if that is a defect, I find that plaintiff's enforcement has been both reasonable and diligent.[2] General Electric Co. v. Kimball Jewelers, supra.

On the matter of trading stamps I find that large local chains of grocery and household supply stores, or supermarkets, have, particularly since the fall of 1955, engaged in practices typified by the trading stamp operation licensed by the intervening plaintiff Sperry & Hutchinson Co., hereinafter called S. & H. Plaintiff admittedly acquiesces in this practice. The licensee stores are so numerous, and their business so extensive, that if this constitutes acquiescence in violations of

---

1. A number of the defendants contend that they are outside the appropriate scope of an injunction. Some of the violations complained of are taking place in a self-service department store known as the Forest Hills Factory Outlet. The defendant who owns the store points out that plaintiff's goods are sold by a concessionaire. However, he is the apparent seller from the standpoint of the purchaser. Timmins v. F. N. Joslin Co., 303 Mass. 540, 22 N.E.2d 76, 123 A.L.R. 591; Barron v. McLellan Stores Co., 310 Mass. 778, 39 N.E.2d 953. Furthermore, he participates actively in each sale by virtue of operating the check-out and cash register proceeding which completes it. Other defendants operate this concession and other violators through close-

ly held corporations, which are, in effect, straws. I think that individual controllers of policy may fall within the injunctive process. I accordingly speak of the defendants collectively.

2. To the extent that this finding may involve the resolution of actual conflicts in testimony I was in the main more disposed to accept plaintiff's witnesses than defendants'. Particularly I was not impressed that the violations were as extensive as defendants maintained. Also, the concealment of the ownership of the violating concession at Forest Hills, and the attempted explanation that the denial was only of the ownership of the entire store, was generally indicative of something less than candor.

the Act plaintiff has not been, subject to certain considerations that I shall deal with, reasonable and diligent in its enforcement. The trading stamp procedure is as follows: When a customer of the store pays for his purchases he receives one S. & H. stamp for every full 10 cents of his total bill. He may paste these in an S. & H. book provided, which holds 1,200 stamps. When he has acquired not less than one full book (representing purchases totalling $120) he may exchange it for special merchandise, catalogued, advertised, and provided by S. & H. The market value of this premium merchandise runs about $3 per book, or 2½% of the gross bills the customer had to pay to fill the book. With the exception of liquor and cigarettes, the customer receives stamps for every article purchased. Fair-traded articles are sold at minimum fair trade prices. Defendants contend that giving stamps on such articles, accordingly, violates the Act. Plaintiff and S. & H. contend otherwise, and maintain that this is not price-cutting, at least within the Act, but an innocuous discount for cash.[3]

I find that these stores operated on a cash basis before they adopted S. & H. stamps; that they did not adopt stamps for the purpose of evading the Act, and, if material, that both they and the plaintiff, whose fair-traded products they sell, in good faith believe they are not violating. As to defendants, I find that they cut prices substantially, often 15–20%; that they do so on fair-traded goods as well as other general market prices; that this is an aggressive method of merchandising, not adopted because of, or for the purpose of, meeting the competition of trading stamps, but for more general purposes, and that defendants are using the trading stamp situation as a fortuitous circumstance to escape what otherwise would be an inevitable injunction.

In support of the proposition that a discount for cash is not a reduction in price, I was given the benefit of the expert opinion of a leading c.p.a., whom I find as qualified as any one, (short, of course, of the presumed expertness of the court), to express opinions. It is his view that a cash discount is an agreement separate from a sale, and constitutes a unilateral offer by the vendor to pay something if the buyer will pay in cash, and does not affect price. He testified that retail stores which extend credit find that this costs them four or more per cent of the amount of their bills, and that a discount for cash, if within such limits, should properly be regarded simply as an offsetting expense. Defendants say, well and good, but when a buyer gets a discount for cash, he is getting something extra. In net effect he is paying not the price asked, but the price less the value of the discount, and therefore less than the fair trade price. This argument has a ready appeal. Plaintiff suggests an answer to it, which may be illustrated by considering the opposite end of the stick. Suppose a vendor sells for the fair trade price for credit, bills to be rendered at the end of the month, payable net in 30 days—a common arrangement in department stores that sell fair-traded items. It is obvious that this credit costs the vendor money. By the same token, the customer receives something. He in effect obtains a 30–60 day loan, interest free. The buyer, to follow defendants' reasoning, in net effect, receives not only the product for the fair trade price, but also the value of a time loan of the money he would need if he dealt with a store that required cash. Is such loan any different from a trading stamp?

■■ I cannot believe that the legislature in passing the Act intended to strike down this department store type of credit transaction. Otherwise it

3. It also appears that these stamps may be given, if a store wishes, for paying monthly bills within 15 days of the time rendered. The extension of credit by these stores is rare. Nor, essentially, do I believe that the problem raised is substantially different, and I disregard these short credit transactions, and any apparent complications they may seem to introduce.

would mean that stores which permit charge accounts could not sell fair-traded articles at minimum fair trade prices. At what price, then, should they sell? Concluding, as I do, that the legislature did not intend to interfere with this normal credit arrangement, it may be logical to find that it did not intend to interfere with other normal credit arrangements. One might determine, for instance, that it was not intended to prevent the giving of reasonable terms, such as 2% off if bills are paid in 10 days, interest after 30 days. I do not, however, find it necessary to decide this question. Even if it may be within the meaning of the Act to allow a reasonable discount for cash, that is to say, that a price can be regarded as maintained even if such a discount is given, (as to which there is a split of authority[4]), I believe this should be the very limit of the law. S. & H. concedes, as it must, that a so-called trade discount must be differentiated. Among trade discounts are quantity discounts, prices reduced for quantity purchases, and quota discounts, prices reduced retroactively if during a stated period purchases total a certain amount. I find that S. & H. trading stamps include a trade discount as well as a discount for cash.

Trading stamps have no value unless and until one fills a whole book. The average customer of a supermarket purchases about $4 worth of goods at a time. He gets no "cash" discount for this, alone. He earns his discount only by visiting S. & H. licensees enough more times to spend $120. This is a direct[5] quantity discount, paid retroactively like a quota discount, even if it may be said that it includes a discount for cash.[6] Plaintiff's expert conceded that trading stamps are more effective in increasing volume of sales than is an ordinary cash discount for cash. In view of their great popularity with merchants, I believe the difference is substantial, and that roughly that difference is the measure that they exceed a true discount for cash.[7] Accordingly, even if I accept S. & H.'s proposition that a reasonable discount for cash is not inconsistent with the maintenance of the minimum price, it does not go far enough.

It is true that dollar-wise any price reduction effected by trading stamps is not large. On this is based an argument that it is "reasonable." Nonetheless, a price is either cut or not cut. The Act makes no provision for reasonable deductions, except as specifically provided, or for degrees of price cutting.[8] Nor

4. E. g., Bristol-Myers Co. v. Lit Bros., Inc., 336 Pa. 81, 6 A.2d 843 (pro), Bristol-Myers Co. v. Picker, 302 N.Y. 61, 96 N.E.2d 177, 22 A.L.R.2d 1203; (contra), both by divided courts; R. J. Peacock Canning Co. v. Commodity Credit Corp., D.C.Cir., 185 F.2d 894, 896. See also cases infra, note 9.

5. Besides the direct one I believe there is an additional psychological quantity discount. S. & H. redeems only in merchandise. The more attractive premiums require several books, and doubtless they are what most persons want. Relatively few would be satisfied with a one-book $3 toaster.

6. It is true that the Massachusetts court has spoken of trading stamps as constituting a " 'discount in cash' ". Sperry & Hutchinson Co. v. Director of Division of Necessaries of Life, 307 Mass. 408, 415, 30 N.E.2d 269, 273, 131 A.L.R. 1254. This, however, was simply in connection with determining that the business was legitimate, and not in the instant frame of reference. I do not regard such a decision as requiring me to find on the present record that they are not a discount for cash plus something else.

7. The distinction between what I would consider strictly a discount for cash is illustrated by Court's Exh. 1. This is a purchase certificate redeemable in any regular merchandise sold by the vendor, on slightly under a 2% basis, with no minimum, and, accordingly, no premium on quantity.

8. It is true that the Act requires a plaintiff who brings suit against a violator to show that he was damaged thereby, but I believe this to be for the purpose of identifying a party who can sue, and not to raise the issue of the extent of damage in each case. When the shoe is on the other foot, and a defendant seeks to show that he is such a small violator that a large manufacturer could not be

do I feel it important that trading stamps are given on all merchandise across the board, whether fair-traded or not. A quantity discount on fair-traded products is no less a quantity discount by reason of the fact that it is given on other articles as well.[8½]

■■ In spite of this I do not find that plaintiff's toleration of trading stamps has constituted a waiver, or unclean hands. This was simply a mistake of law, and, in view of the state of the authorities,[9] I find that it was a reasonable one.[10] However, for present purposes, the mistake is now discovered, and I cannot grant an injunction while plaintiff tolerates the practice. The motion for a preliminary injunction is denied at this time. Since equity is not restricted to the situation as it exists at the onset of the suit, if the plaintiff later satisfies me that appropriate steps are being taken to eliminate such violations I will then issue it.[11]

### Supplementary Opinion

■ It appears that following the original opinion the plaintiff concluded to adopt the position that trading stamps, at least in part, reduce prices. It has formally notified its known customers who offer such to desist, and is about to sue those who do not comply. I am satisfied that plaintiff is proceeding expeditiously and in good faith, and will continue to do so. Preliminary injunction to issue.

### Second Supplemental Opinion

■ Because of the circumstances referred to in my supplemental opinion of June 20, 1956 a question has arisen as to what action I should take with respect to S. & H., plaintiff intervenor. It seems to me that the matter on which it sought a determination has now become moot. At an earlier stage of the case defendants took the position that they had, in effect, an affirmative defense arising out of plaintiff's toleration of the giving of trading stamps with its fair-traded articles. Following my opinion of June 8, and before any judgment had been entered, plaintiff took steps to rectify this, and the circumstances giving rise to this special defense, if it ever was a defense, no longer exist. As between plaintiff and defendants that question would appear to have become moot. This point is not established by, but it is accentuated by virtue of the fact that these parties inform me that none of them wishes to appeal. I find it difficult under these circumstances, not only to see what relief is open to intervenor, but even against whom I can properly deny it relief, as the underlying basis for either is gone.

■ Appreciating this difficulty intervenor has sought to file a motion, with supporting affidavit, for entry of a declaratory judgment. I do not see how this helps the situation. With whom does intervenor have a controversy?

substantially affected, the latter is quick to point out that it is "the little rift * * * that by and by will make the music mute." The very existence of trading stamp competition, while it may not have determined the conduct of these particular defendants, doubtless stimulates retaliation, and I feel that a baby may not be disregarded just because it is a very small one.

8½. A frank policy of cutting all prices equally, whether fair-traded or not, could not be justified on the ground that it was not discriminating against the former. The Act sets a mathematical standard, not an adjectival one.

9. See, e. g., Weco Products Co. v. Mid-City Cut Rate Drug Stores, 55 Cal.App.2d 684, 131 P.2d 856, 858 (a case, however, which seems peculiarly erroneous because the store sometimes had "'double stamp days'".); Sperry & Hutchinson Co. v. Margetts, 15 N.J. 203, 104 A.2d 310, and cases cited note 4, supra.

10. In Trade Commission v. Bush, Utah, 259 P.2d 304, the court held that where trading stamps were used in ignorance of their effect it was not a violation at all.

11. The dog does not have to have arrived in Dover, cf. Eastman Kodak Co. v. Lee-Wilson, Inc., D.C.D.Mass., 138 F.Supp. 591, 594, but he should be on his way.

Not with plaintiff. Plaintiff originally advanced the same contentions as intervenor. It has now abandoned those contentions, but it does not now contend the opposite, at least in this proceeding. Nor with defendants. There was originally a dispute with the defendants, but the subject-matter of the dispute has now disappeared, at least in this proceeding. The defendants have never issued trading stamps, and do not now seek to. Consequently, if I were to enter a judgment on the merits against intervenor, and intervenor were to appeal, who would be the appellee? Equally, who would be the appellant if I were to change the views expressed in my original opinion, so far as they relate to intervenor.

Intervenor maintains, and, indeed, I have already found, that the question of whether the issuance of trading stamps conflicts with the fair trade law is in litigation between these same parties in the Massachusetts courts. It argues that this indicates the existence of a controversy. The difficulty with this argument is that by the same token it discloses that the controversy will be there resolved, so that there is no need of further considering it here. This is not a case like Occidental Life Ins. Co. of Cal. v. Nichols, 5 Cir., 216 F.2d 839, where the state litigation might not dispose of the controversy. On the contrary, the state court should dispose of it, and it being a question of Massachusetts law, it is appropriate that it be the one to do so. My opinion of June 8, 1956 was no more than an attempt to rule on what I believed to be the Massachusetts law, on a matter then before me. It is now further downgraded, so far as it purports to affect intervenor, to obiter dicta.

I refuse to accept for filing, as matter of law, or alternatively, as a matter of discretion, plaintiff intervenor's motion for entry of a declaratory judgment, and I dismiss as moot its original complaint.