COLGATE-PALMOLIVE COMPANY *vs.* ELM FARM FOODS CO.
(and five companion cases[1]).

Suffolk. November 4, 5, 1957. — March 11, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, COUNIHAN, &
WHITTEMORE, JJ.

*Fair Trade Law. Trading Stamp. Unfair Competition. De Minimis non
curat Lex. Constitutional Law,* Fair trade law, Equal protection of
laws.

The use of a trading stamp or similar plan in connection with all articles
sold for cash in a retail store, including fair traded articles representing
only a small part of its business, whereby customers received stamps
or an equivalent entitling them ultimately to additional merchandise,
constituted price cutting and unfair competition with respect to the
fair traded articles within § 14B of the fair trade law, G. L. c. 93,
§§ 14A–14D, even though such plan was a means of promoting the
store as a whole. [226–227]

Price cutting through the use of a trading stamp or similar plan in con-
nection with sales of fair traded articles in a retail store was not pro-
tected from being enjoined as unfair competition under § 14B of the
fair trade law, G. L. c. 93, §§ 14A–14D, by a finding that the use of
such plan did not "have any economic effect upon the individual . . .
[article] sold by the retailer, or its good will," or by the principle of
de minimis non curat lex in that the fair traded articles represented
only a small part of the store's business and that the discount given
by use of such plan was only a small percentage. [227–228]

Application of § 14B of the fair trade law, G. L. c. 93, §§ 14A–14D, so as
to prevent retailers selling fair traded articles for cash from using
trading stamp or similar plans in such a way as to effect price cutting
constituting unfair competition under the statute was not unconsti-
tutional as a prohibition of or an undue restriction on use of the plans
or as denying equal protection of the law to such retailers for cash in
competition with other retailers selling on credit or furnishing other
services. [228–229]

SIX BILLS IN EQUITY, filed in the Superior Court, five on
June 22, 1956, and the sixth on June 25, 1956.

[1] The companion cases are by the same plaintiff against Stop & Shop, Inc.,
Star Market Co., Food Center, Inc., Tedeschi's Super Markets, Inc., and
Supreme Markets, Inc.

The suits were heard together by *Lurie,* J.

*John F. Groden, (Sidney Coggan* of New York *& Charles C. Worth* with him,) for the plaintiff.

*George E. Lodgen & Samuel M. Lane, (Robert F. Young* of Ohio, *Edward H. Bennett, Jr., & Thomas M. Joyce* with them,) for the defendants.

SPALDING, J.    The plaintiff, a manufacturer of toilet articles, brings these bills in equity under the fair trade law (G. L. [Ter. Ed.] c. 93, §§ 14A–14D) to enjoin the defendants from issuing to their customers trading stamps or cash register receipts, redeemable in merchandise, in connection with sales of fair traded items.    The defendants are Elm Farm Foods Co. (hereinafter called Elm Farm), Stop & Shop, Inc. (hereinafter called Stop & Shop), Star Market Co. (hereinafter called Star), and Supreme Markets, Inc. (hereinafter called Supreme).[2]

Many facts were stipulated by the parties.    Evidence was introduced, on the basis of which the judge found additional facts.    He then reported the case, without decision, on the pleadings, the facts, his rulings, and the evidence.    See G. L. (Ter. Ed.) c. 214, § 31.

The plaintiff, prior to the commencement of these suits, by contract with certain retailers had, under G. L. (Ter. Ed.) c. 93, §§ 14A and 14B, as amended, established minimum fair trade prices on certain toilet articles manufactured and distributed by it which bore its trade mark, brand or name. These articles are in "fair and open competition with commodities of the same general classes" produced by others, and the plaintiff has spent large sums of money in advertising and promoting these products, and has established a valuable reputation and good will for them.    None of the defendants had entered into any fair trade contracts with the plaintiff.

---

[2] Two of the defendants were Food Center, Inc., doing business as New England Food Fair, and Tedeschi's Super Markets, Inc., but we were informed at the arguments that they have discontinued the use of trading stamps, and their counsel have filed no briefs and have withdrawn their appearances. Accordingly we do not deem it necessary to discuss their stamp plans or methods of doing business.

Each defendant conducts a chain of supermarkets, so called, in which are sold meats, groceries, vegetables, toilet articles, household wares, and other merchandise commonly sold in such markets. All sales are for cash only, except that credit is extended in three small stores in the Stop & Shop chain (which amount to one per cent of its entire sales), and four per cent of Star's sales are on credit.

The defendants sell the plaintiff's fair traded products as part of their retail business, but sales of fair traded items are only a small part of their business (about two per cent) and sales of the plaintiff's fair traded products are an even smaller part (about two tenths of one per cent) of their business. At all times here relevant the defendants have had knowledge that fair trade contracts have been in effect on many of the plaintiff's products, and have been informed by the plaintiff of the fair trade prices established by such contracts.

In order to attract customers to their stores, the defendants have adopted plans whereby customers, after making a minimum amount of purchases, receive additional merchandise, the value of which depends on the value of the purchases made.

Elm Farm started using the S & H green stamp plan in 1954 and Stop & Shop started using the Top Value stamp plan in 1955. Briefly these plans operate in this way. On making a purchase in an Elm Farm or Stop & Shop store the customer is given one S & H green stamp or one Top Value stamp, as the case may be, for each full ten cents worth of merchandise purchased. Thus a customer making a purchase of $1.19 receives eleven stamps. The customer is given a book in which to paste the stamps, and when at least one book has been filled he may redeem the stamps for merchandise either at a redemption center maintained by the stamp company or by mail at one of its warehouses. It takes purchases of $120 to fill an S & H stamp book and purchases of $150 to fill a Top Value book. Under both plans the value of the merchandise redeemed is about two and one half per cent of the purchases made.

The S & H and Top Value plans are operated respectively by the Sperry & Hutchinson Company and Top Value Enterprises, Inc., in many parts of the country. The retail store using the plan does so under a license issued by the stamp company. The stamp company sells the stamps to the retailer, supplies the stamp books, merchandise and catalogs, and operates the redemption centers and warehouses. They also license other stores in the community so that the customer can participate in the plan at a number of stores.

Star's plan, the Star Tape-Savers Club, is similar in principle to the stamp plans. There are, however, differences in its operation. Instead of issuing stamps, Star has a special cash register tape (called Gold Tape) which the customer saves until he has enough for redemption. Star issues a catalog which lists the merchandise which may be redeemed with Gold Tapes, and the amount of Gold Tape purchases required for each item. Star maintains no redemption store. When a customer has accumulated enough value in tapes to obtain the article he wants, he makes known his choice and turns in the required tapes at any Star market, and in due time receives the merchandise. The retail value of merchandise thus obtained is between two per cent and three per cent of the amount indicated on the tape.

Supreme has a tape plan quite similar to Star's. It has no catalog and the merchandise available for redemption is on display at its stores. The retail value of this merchandise is between three per cent and four per cent of the amount indicated on the tapes and may be obtained on the presentation of tapes totaling from $29 to $69.

In all of the plans described above the stamps and tapes are issued on all items purchased, regardless of whether they are fair traded or not.

From evidence introduced below, the judge found that stamps and tapes are "typical discounts for cash at the retail level"; that the normal cost of extending credit in well managed retail stores is three per cent to four per cent of

gross sales; that stamps and tapes are a form of institutional or store promotion rather than product promotion; and that stamps and tapes do not have any "economic effect upon the individual product brand sold by the retailer, or its good will."

The question for decision is whether the above described stamp and tape plans when used in conjunction with the sale of the plaintiff's fair traded products constitute price cutting of the sort forbidden by our fair trade law. G. L. (Ter. Ed.) c. 93, §§ 14A–14C. Under § 14A it is lawful, with exceptions not here material, to make a contract fixing the price of a commodity bearing the trade mark, brand or name of the producer or owner provided such commodity is in fair and open competition with commodities of the same general class produced by others. Section 14B, as amended by St. 1939, c. 313, reads: "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the preceding section, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is hereby declared to constitute unfair competition and to be actionable at the suit of any person damaged thereby. Any person advertising, offering for sale or selling any commodity as aforesaid shall, in addition, forfeit through civil process to the commonwealth the sum of fifty dollars."

The constitutionality of the fair trade law was challenged and upheld in *General Electric Co.* v. *Kimball Jewelers, Inc.* 333 Mass. 665. Although the question whether stamp and similar plans constitute a reduction of price not sanctioned under fair trade laws has been before courts in other jurisdictions, the question is one of first impression here. The Supreme Court of Pennsylvania in *Bristol-Myers Co.* v. *Lit Brothers, Inc.* 336 Pa. 81, held by a divided court (five to two) that a stamp plan substantially similar to those here did not constitute a violation of the Pennsylvania fair trade act. This decision was recently followed by a unanimous

court in *Gever* v. *American Stores Co.* 387 Pa. 206. The same result was reached by the District Court of Appeals of California in *Weco Products Co.* v. *Mid-City Cut Rate Drug Stores,* 55 Cal. App. (2d) 684. On the other hand in *Bristol-Myers Co.* v. *Picker,* 302 N. Y. 61, the New York Court of Appeals by a divided court (five to two) held that a cash register receipt plan substantially the same as those under consideration amounted to a price reduction not permitted by the New York fair trade law.[1] And see *Colgate-Palmolive Co.* v. *Max Dichter & Sons, Inc.* 142 Fed. Sup. 545 (D. C. Mass.), holding that a stamp plan identical to one here constitutes a quantity discount not permitted by our fair trade law.

The defendants' main contentions are (1) that the issuance of stamps and tapes in conjunction with the sale of the plaintiff's fair traded products is not a price reduction and (2) that this practice has no adverse effect on the plaintiff's good will.

The defendants argue that the stamps and tapes are merely means of promoting the store as a whole in contradistinction to promotion directed toward a particular product. As used by them these plans are not limited to fair traded items but are given in conjunction with *all* purchases made at their stores. Thus, it is argued, these do not differ from other store promotional schemes such as free parking, free taxi transportation, air conditioning, free delivery service and the like. We assume that such services do not constitute price reductions within the intendment of the fair trade law. They are, however, quite different from the stamp and tape plans here challenged. Such services have only a remote and indirect relation to the article purchased or the price paid. But with the issuance of stamps or tapes a direct and tangible benefit is received by the customer which is specifically and inseparably related to the article purchased and its price. We are mindful that the judge found that the issuance of stamps and tapes by the defendants was a "form of institutional or store promotion"

---

[1] None of the fair trade laws involved in these decisions differed substantially in its relevant provisions from ours.

and also constituted discounts for cash. But these findings do not dispose of the case. We still must decide, however the schemes may be labeled, what the legal effect of them is vis-à-vis the fair trade law.

We lay to one side the difficulty we have in seeing how stores which sell almost exclusively for cash can give the customer a cash discount for doing what he has to do anyway. We think there is a more fundamental answer. As Judge Froessel said, speaking for the majority of the court, in *Bristol-Myers Co.* v. *Picker*, 302 N. Y. 61, at page 68, "No matter how one puts it, the consumer who is accorded a cash discount in reality pays that much less for the article which he purchases, and this is none the less true because the return is by way of merchandise rather than coin which may purchase merchandise. When defendants sold plaintiff's products at fair trade prices, and as part of the same transaction gave their customers cash register receipts having a redemption value of $2\frac{1}{2}\%$ of such fair trade prices, they, in effect, sold plaintiff's products at $2\frac{1}{2}\%$ less than the prices fixed. I can see no distinction between returning to the customer a credit memorandum of $2\frac{1}{2}\%$ and giving him a cash register receipt. And whether the discount is small or large makes no difference — the statute forbids both." The force and logic of this reasoning impress us as unanswerable. We recognize that other courts have come to a different conclusion, but the reasoning on which their decisions are based does not persuade us.[1] There is no magic in the words "cash discount." When subjected to analysis they are merely a euphemism for what is in reality a price cut.

The defendants' case is no stronger by the further finding of the judge that these plans do not "have any economic effect upon the individual product brand sold by the re-

---

[1] *R. J. Peacock Canning Co.* v. *Commodity Credit Corp.* 185 Fed. (2d) 894 (C. A. D. C.). *Food & Grocery Bureau of Southern California Inc.* v. *Garfield*, 20 Cal. (2d) 228. *Weco Products Co.* v. *Mid-City Cut Rate Drug Stores*, 55 Cal. App. (2d) 684. *Sperry & Hutchinson Co.* v. *Margetts*, 25 N. J. Super. 568, affirmed 15 N. J. 203. *Safeway Stores, Inc.* v. *Oklahoma Retail Grocers Association, Inc.* 322 P. 2d 179 (Okla.). *Bristol-Myers Co.* v. *Lit Brothers, Inc.* 336 Pa. 81. *Gever* v. *American Stores Co.* 387 Pa. 206.

tailer, or its good will." The fair trade law unqualifiedly provides that price cutting fair trade articles in and of itself is unfair competition. The objective of the law is to protect the good will of the trade mark owner, and when a commodity which bears a brand name is resold for less than the minimum price specified in the fair trade contracts such conduct is a violation of the plain mandate of the fair trade law and is properly restrained by injunctive relief. The statute makes it clear that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes unfair competition which is actionable without proof of pecuniary loss. To hold otherwise is to quarrel with the purpose of the statute. See in this connection *Bristol-Myers Co.* v. *Picker*, 302 N. Y. 61, at page 70.

The defendants argue that the discounts given in the plans here challenged fall within the de minimis principle. But, although that was one of the grounds on which the Supreme Court of Pennsylvania rested its decision in *Bristol-Myers Co.* v. *Lit Brothers, Inc.* 336 Pa. 81, 91, we do not find it persuasive. As pointed out above the statute forbids discounts whether they are large or small.

The defendants further argue that if the fair trade law is construed to prohibit the issuance of stamps and tapes with fair traded merchandise it is an undue restriction on the use of such devices and hence unconstitutional. Both in decisions and in advisory opinions this court has stated that the issuance of trading stamps was a legitimate practice which could not be made unlawful by legislative enactment. *O'Keeffe* v. *Somerville*, 190 Mass. 110. *Opinion of the Justices*, 208 Mass. 607. *Opinion of the Justices*, 226 Mass. 613. *Sperry & Hutchinson Co.* v. *Director of the Division on the Necessaries of Life*, 307 Mass. 408. But none of these decisions or opinions deals with the question here raised.

The defendants undoubtedly have a right to issue trading stamps with all their sales. But like all rights, this right cannot be exercised in such a way as to injure the rights of others. The fair trade law was enacted on the theory that

manufacturers have a right to have their good will protected, and that any form of price cutting tends to destroy that good will. Our decision in *General Electric Co.* v. *Kimball Jewelers, Inc.* 333 Mass. 665, necessarily holds that a manufacturer's good will is a valid legislative interest, and that the means adopted to protect that good will are appropriate. Our decision in this case does not prohibit, nor, we think, does it unduly restrict the issuance of trading stamps on fair traded items. It requires only that, when a fair traded article is sold, trading stamps should not be issued in such a way that the effective sale price is below the minimum resale price. Doubtless if the defendants so choose, they can continue to issue trading stamps on fair traded articles without violating the fair trade law. And, of course, they are free to issue stamps and tapes with respect to commodities which are not fair traded. But regardless of whether they do or do not, we are of opinion that the restriction of the use of trading stamps here is a reasonable restriction, necessary in order to protect the plaintiff's good will.

The defendants argue that an adverse decision will deprive them of equal protection of the laws, because such a decision will prevent the all-cash merchant from giving his customers a benefit similar in value to the benefit which the merchant who sells on credit can give. Admittedly this decision will put at a disadvantage merchants who do not provide this and other services, and who resort to stamp plans as a means of offsetting the competition of a store which provides more services. But a similar argument could be advanced as to almost every application of the fair trade law. The merchant who deliberately sells a fair traded article below the fixed price is undoubtedly trying to get customers away from another store having other attractions. That this practice is forbidden by the fair trade law does not in our opinion render the law unconstitutional under the equal protection clause.

The defendants' final contention is that paragraph 3 of the plaintiff's fair trade contract (to the effect that the making of any kind of concession in the sale of a fair traded article

shall be a breach of the contract) is not authorized by the fair trade law. We need not consider the point, for our decision is based not on this provision but on the fair trade law itself.

The judge found that if upon the facts the defendants have violated the fair trade law then the plaintiff was entitled to the injunctive relief prayed for. It follows that final decrees (except as to such defendants as have discontinued the use of stamps and tapes) granting the injunctive relief prayed for may be entered. The plaintiff is to have costs.                                                *So ordered.*