NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11434


STEVEN M. GLOVSKY  vs.  ROCHE BROS. SUPERMARKETS, INC.



Norfolk.     February 3, 2014. - October 10, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly,
& Lenk, JJ.[1]



Massachusetts Civil Rights Act.  Elections, Ballot.
    Constitutional Law, Elections.  Civil Rights, Coercion.
    Practice, Civil, Election case, Civil rights, Motion to
    dismiss.



    Civil action commenced in the Superior Court Department on
April 2, 2012.

    A motion to dismiss was heard by Renée P. Dupuis, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Steven M. Glovsky, pro se.
    Mark W. Batten for the defendant.
    John Pagliaro & Martin J. Newhouse, for New England Legal
Foundation & others, amici curiae, submitted a brief.
    Adam J. Kessel, Frank L. Gerratana, & Sarah R. Wunsch, for
American Civil Liberties Union of Massachusetts, amicus curiae,
submitted a brief.

---

    [1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

DUFFLY, J.  Steven M. Glovsky sought to solicit signatures for his nomination to public office outside the entrance to a supermarket owned by the defendant, Roche Bros. Supermarkets, Inc. (Roche Bros.), but was informed that Roche Bros. prohibited this activity on its property.  Glovsky filed suit in the Superior Court claiming that Roche Bros. had violated his right to equal ballot access under art. 9 of the Massachusetts Declaration of Rights.  He requested relief under the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (act), for a violation of his rights "by threats, intimidation or coercion."[2] Roche Bros.' motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), was allowed.  Glovsky appealed, and we granted his application for direct appellate

---

[2] General Laws c. 12, § 11I, provides that

"[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief . . . ."

General Laws c. 12, § 11H, applies

"[w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth . . . ."

review. We conclude that Glovsky adequately has alleged a right under art. 9 to solicit nominating signatures outside Roche Bros.' supermarket, but that Roche Bros. did not violate this right "by threats, intimidation or coercion."[3]

Background. The complaint sets forth the following allegations. In early 2012, Glovsky undertook a bid for election to the second district seat on the Governor's Council. To place his name on the September 6, 2012, State primary ballot, Glovsky needed to submit, by May 29, 2012, nomination papers containing at least 1,000 certified names. On February 7, 2012, Glovsky obtained nomination papers from the office of the Secretary of the Commonwealth and began collecting signatures.

On the afternoon of March 14, 2012, Glovsky traveled to a location in Westwood, near the geographic center of the Governor's Council second district, intending to solicit signatures on Roche Bros.' property there. Roche Bros.' Westwood property consists of 4.99 acres and contains a 47,568 square foot supermarket building. As alleged in the complaint,

---

[3] We acknowledge the amicus brief submitted by the American Civil Liberties Union of Massachusetts in support of the plaintiff, and the amicus brief submitted by New England Legal Foundation; Associated Industries of Massachusetts; the Greater Boston Real Estate Board; the Massachusetts Food Association, NAIOP Massachusetts; the Real Estate Bar Association for Massachusetts, Inc.; and the Abstract Club in support of the defendants.

Roche Bros.' Web site describes its Westwood supermarket as "the first to incorporate a 'department' concept of merchandising, adding a bakery, florist, and a restaurant to make shopping more enjoyable." The store is the only supermarket in Westwood, which, as of July, 2009, reported a population of 14,330. Roche Bros. also leases space inside the building to a banking institution, which operates a "full service banking" branch there. The bank has its own separate business logo displayed on the building's marquee, and maintains a twenty-four hour deposit slot in the building's exterior wall

Upon arriving at the Westwood property, Glovsky notified Roche Bros. personnel that he intended to solicit nominating signatures from voters on the sidewalk immediately outside the entrance to the store. Jim Visconti, the store manager, informed Glovsky that Roche Bros. had adopted a policy that "no longer" permitted signature solicitation anywhere on its Westwood property. Glovsky's complaint alleges that he felt "intimidated" by this delivery of Roche Bros.' policy and "threatened by the inherent consequences he understood could result if he acted against such a clearly stated prohibition." As a result, Glovsky left the property despite believing that he had a right under art. 9 to solicit signatures there.

Discussion. a. Standard of review. "We review the allowance of a motion to dismiss de novo, accepting the

allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor."  Harrington v. Costello, 467 Mass. 720, 724 (2014).  To survive a motion to dismiss, these allegations must "plausibly suggest" an entitlement to relief, raising the right to relief "above the speculative level."  Id., quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

b.  Article 9.  Glovsky argues that he has a protected right under art. 9 to solicit signatures in support of his nomination to public office on the property of the Roche Bros. supermarket in Westwood.  Article 9 provides that "[a]ll elections ought to be free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."  This provision protects the "fundamental right" of equal access to the ballot, a "basic right," Opinion of the Justices, 413 Mass. 1201, 1210 (1992), that is "of fundamental importance in our form of government because through the ballot the people can control their government."  Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83, 91, 93 (1983) (Batchelder I).  See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012) (art. 9 protects "fundamental" and "intertwine[d]" rights of candidates to participate equally in

electoral process and of voters to cast their ballots as they see fit). This right of ballot access encompasses an individual's right to solicit signatures in support of a candidate's nomination to public office. See Batchelder I, supra at 84, 92. Significantly, art. 9 does not require State action. See Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, supra at 558; Batchelder I, supra at 88.

In Batchelder I, supra at 84, we held that art. 9 protects the right to solicit nominating signatures in the common areas of a private shopping mall or shopping center, despite the property owner's objection. The present case requires us to consider whether art. 9 extends the right to solicit nominating signatures to private property like that of Roche Bros.' Westwood supermarket, which is not alleged to be a shopping mall or shopping center. As in Batchelder I, supra at 91, "[w]e are concerned with ballot access and not with any claim of a right to exercise free speech apart from the question of ballot access." As we noted in that case, "[t]he difference between free speech and art. 9 rights to free elections and to be a candidate equally with others is not purely theoretical." Id. at 92.[4]

---

[4] In addition to practical differences between the exercise of these rights, art. 16 of the Massachusetts Declaration of Rights, which protects free speech, may contain a State action requirement. See Roman v. Trustees of Tufts College, 461 Mass.

In determining that the plaintiff in Batchelder I had a right to solicit nominating signatures in a shopping mall's common areas, we balanced his need to solicit signatures on the property in order to effectuate his right to equal ballot access against the burden that such conduct would impose on the mall owner's property interests. See id. at 91-93. First, we emphasized that the art. 9 right to solicit signatures, unlike the broader right to free speech protected by art. 16, requires personal contact with voters and cannot be effectuated through other means of communication. Id. at 91-92. Because of the growing importance of shopping malls in retail merchandising, they had begun to function "much as the 'downtown' area of a municipality did in earlier years," and the shopping center at issue represented the "most favorable" area in the district for seeking signatures. Id. at 92-93. Accordingly, prohibiting the plaintiff's access would have "substantially impaired" his art. 9 right. Id. at 93.

Second, the plaintiff sought only to engage in "unobtrusive and reasonable solicitations in the common areas of the mall," not in the stores themselves, so that his activity would not unduly burden the mall owner's property interests; indeed, those common areas "ha[d] been dedicated to the public as a practical

707, 713 (2012) (leaving open whether art. 16 extends to private property).

matter" based on the mall owner's use of the property to host frequent civic, charitable, and other events in order to attract customers and generate goodwill.  See id. at 92, 93 n.12.  Nor had the mall owner shown that requiring it to permit access by those soliciting nominating signatures would infringe its own constitutional property or speech rights, either by adversely affecting its economic interests or by forcing it to associate with the plaintiff's views.  Id. at 93.  The mall owner adequately could protect its interests by adopting reasonable time, place, and manner restrictions to minimize the burden that signature solicitation placed on it.  Id. at 84, 93.[5]

---

[5] We have not had occasion since Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83 (1983) (Batchelder I), to address the scope of the ballot access right in art. 9 of the Massachusetts Declaration of Rights.  Our subsequent discussion of Batchelder I in cases dealing with free speech rights under art. 16, however, provides guidance as to the factors that might be considered when weighing any limitations on the art. 9 right. As these cases suggest, the balance of interests between an individual soliciting nominating signatures and the owner of private property would come out differently if the property owner has not opened the premises to the public for the owner's own commercial benefit.  See Commonwealth v. Hood, 389 Mass. 581, 585-586 (1983) (Batchelder I distinguished where case involved art. 16 rights, and private technology laboratory did not open its property for its commercial benefit, although it did permit public to pass through property's outdoor area). Likewise, the balance would come out differently if the property is devoted to activities involving a small or narrow group of clientele or a special expectation of privacy.  See Ingram v. Problem Pregnancy of Worcester, Inc., 396 Mass. 720, 722-723 (1986) (Batchelder I distinguished where case involved art. 16 rights, and private property at issue consisted of interior corridors of office linebuilding that housed reproductive health care clinic).  See also Batchelder I, supra at 89 n.8

Roche Bros. seeks to limit the exercise of the art. 9 right to the common areas of a large shopping mall, thereby creating a bright-line distinction between such common areas and the area immediately outside the entrance to a supermarket. Pointing to our observations in Batchelder I, supra at 92, that shopping malls had begun to "function in many parts of this State much as the 'downtown' area of a municipality did in earlier years" and that the common areas of the mall in question "ha[d] been dedicated to the public as a practical matter," Roche Bros. argues that art. 9 protects solicitation of nominating signatures only on private property that serves as the functional equivalent of a traditional public forum. Citing cases from California and other jurisdictions, Roche Bros. contends that the private property located at the entrance to a free-standing retail establishment, such as the supermarket here, does not meet this test because the owner of such property has invited the public only to pass through the area in entering

---

(distinguishing parking lot of private hospital). Cf. PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 78 (1980), quoting Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 910 (1979) (distinguishing "modest retail establishment"). Here, by contrast, the property at issue is a large, private supermarket to which members of the general public are invited and which offers numerous amenities to attract a significant number of people with diverse needs and interests. Cf. Marsh v. Alabama, 326 U.S. 501, 506 (1946) ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it").

or exiting the store, not to congregate there.[6]

Roche Bros. misreads our opinion in Batchelder I. Functional equivalence to a traditional public forum is not the test for determining whether art. 9 protects signature solicitation on private property. For example, in Commonwealth v. Hood, 389 Mass. 581, 585-587 (1983), we distinguished Batchelder I based on the different right at stake and the different property in question, and only separately and for purposes of addressing a claimed right under the First Amendment to the United States Constitution did we discuss whether the property served "a public function" or had been "dedicated to certain types of public use" (citation omitted). Id. at 587. Rather, the extent to which private property serves the role of a traditional public forum or effectively has been dedicated to the public is relevant in the context of art. 9 only as a factor in balancing the interests of the individual soliciting signatures against those of the property owner.[7]

_____

[6] See, e.g., Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8, 55 Cal. 4th 1083, 1092-1093 (2012), cert. denied, 133 S. Ct. 2799 (2013); Van v. Target Corp., 155 Cal. App. 4th 1375, 1388-1389 (2007); Albertson's, Inc. v. Young, 107 Cal. App. 4th 106, 120-122 (2003); Costco Cos. v. Gallant, 96 Cal. App. 4th 740, 755 (2002); Trader Joe's Co. v. Progressive Campaigns, Inc., 73 Cal. App. 4th 425, 433-434 (1999); Waremart, Inc. v. Progressive Campaigns, Inc., 139 Wash. 2d 623, 636-637 (1999).

[7] Indeed, private property's function as a traditional public forum serves as the test for State action in this

In many rural and suburban communities, the local supermarket may serve as one of the few places in which an individual soliciting signatures would be able to approach members of the public in large numbers. We disagree with Roche Bros.' contention that, for purposes of a claim to ballot access under art. 9, the privately owned area immediately outside the entrance to such a supermarket differs as a matter of kind from the common areas of a shopping mall or shopping center so as to warrant dismissal of Glovsky's claim pursuant to Mass. R. Civ. P. 12 (b) (6).[8] Applying the balancing test employed in Batchelder I to the facts as asserted in Glovksy's complaint, we conclude that Glovsky adequately has alleged a right under art. 9 to solicit nominating signatures on the private property outside the entrance to Roche Bros.' Westwood supermarket.

---

context. See, e.g., Central Hardware Co. v. National Labor Relations Bd., 407 U.S. 539, 547 (1972) (for conduct of private property owner to qualify as State action, "the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use"). Accordingly, the strict functional equivalency test urged by Roche Bros. effectively would impose the type of State action requirement that Batchelder I, supra at 88, expressly rejected. Instead, art. 9 demands a more pragmatic and flexible view of the extent to which private property serves the public in the manner of a traditional public forum such that excluding signature solicitors from that property would undermine the right to equal ballot access. See Batchelder I, supra at 88-89, 92-93.

[8] As Roche Bros. concedes, none of the out-of-State cases on which it relies were decided in the context of a motion to dismiss.

Glovsky has alleged a substantial interest in soliciting signatures in this area for his nomination to public office. He "cannot reasonably obtain" such signatures other than by "personal contact with voters," Batchelder I, supra at 92, and "[f]rom the standpoint of a signature gatherer . . . there could hardly be a more ideal or efficient spot to conduct one's business than the single entrance and exit of a [supermarket or giant] grocery store." Waremart, Inc. v. Progressive Campaigns, Inc., 139 Wash. 2d 623, 649 (1999) (Madsen, J., concurring). In general, supermarkets offer a variety of groceries, household items, and other merchandise that in many communities would be dispersed among several shops along a public way. See, e.g., Colgate-Palmolive Co. v. Elm Farm Foods Co., 337 Mass. 221, 223 (1958) (supermarkets commonly sell "meats, groceries, vegetables, toilet articles, household wares, and other merchandise"). In addition to such items, the Westwood property includes a bakery, a florist, and a restaurant. It also accommodates a "full service banking" branch. Because the property allegedly contains the only supermarket in Westwood, as well as these other amenities, it reasonably can be inferred that the property draws a significant portion of the town's voters. In some communities, an individual might solicit signatures from members of the public as they traverse the public way connecting the various shops that offer such

amenities; to deprive Glovsky of similar access to the public where the assorted products have been consolidated under a single roof could "substantially impair[]" the fundamental rights protected by art. 9.  See Batchelder I, supra at 93.

Moreover, the allegations in the complaint support the reasonable inference that allowing individuals to solicit nominating signatures in the area outside the Westwood supermarket building would not unduly burden Roche Bros.' property interests.  Roche Bros. invites the public at large to shop at its property and offers numerous amenities to attract a significant number of people with diverse needs and interests. Furthermore, as the only supermarket in Westwood and especially given the other features it offers, it is likely that the property does draw large numbers of people on a daily basis.[9] Like the plaintiff in Batchelder I, supra at 92, Glovsky seeks only the right to engage in "unobtrusive and reasonable solicitations" outside the store entrance.  Nothing in the

---

[9] Contrary to the dissent's assertion, see post at    , we do not suggest that the art. 9 right to solicit nominating signatures extends to small-scale general stores just because they offer a variety of goods.  See note 4, supra.  Such small-scale stores attract fewer customers than does a supermarket of the type at issue here, thereby both diminishing an individual's need to solicit signatures there and increasing the relative burden that such solicitation places on the property owner. Furthermore, many of these small-scale stores abut public walkways, so that individuals soliciting signatures would have access to the store's customers without entering the private property.

undeveloped record before us suggests that the proposed, presumably brief, interactions with shoppers as they enter or leave the supermarket would interfere with Roche Bros.' use of its property.[10]

Roche Bros. argues that, as compared to the common areas of a shopping mall, requiring it to permit signature solicitation outside its entrance would impose an undue burden because the close proximity to its free-standing establishment would create greater risks both that Roche Bros. will be seen as indorsing the potential political candidate in question and that its patrons will be unable to avoid the solicitations as they enter or leave the supermarket. Without further evidentiary support, however, these hypothetical risks do not outweigh the interest of an individual seeking nominating signatures in accessing the property. It cannot be assumed at this stage of the proceeding that Roche Bros. would be identified with the views expressed by a person soliciting nominating signatures merely because the person does so on premises owned by Roche Bros. but open to the general public. See Batchelder I, supra at 93. See also PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 87 (1980) (PruneYard). For example, Roche Bros. could post signs in the

---

[10] The statement attributed to Roche Bros.' store manager that Roche Bros. "no longer" permits signature solicitation on the Westwood property implies that Roche Bros. previously did permit such solicitation.

area disavowing any association with potential political candidates. See PruneYard, supra. Additionally, Roche Bros. could prevent those soliciting signatures from harassing its patrons and impairing its commercial interests by prescribing reasonable restrictions on the location, time, and manner in which the nominating signatures may be sought. See Batchelder I, supra at 84, 93. See also PruneYard, supra at 83.[11]

We are not persuaded by the California cases on which Roche Bros. relies for the proposition that a State constitutional right to engage in expressive activity in the common areas of a shopping mall should not extend to the area outside a supermarket.[12] See note 6, supra. California decisional law recognizes an expansive right to engage in free speech on

---

[11] The dissent concludes that Roche Bros.' concerns about indorsement and interference outweigh Glovsky's admittedly strong interest in soliciting signatures because such solicitation "may" negatively impact Roche Bros. See post at . At this stage of the proceeding, our obligation under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), is to "accept[] the allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." Harrington v. Costello, 467 Mass. 720, 724 (2014).

[12] Although our decision in Batchelder I favorably cited California precedent, California case law at the time apparently extended its State constitutional free expression right to the area outside a supermarket. See Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 908-909 (1979), citing In re Lane, 71 Cal. 2d 872, 878 (1969). See also National Labor Relations Bd. v. Calkins, 187 F.3d 1080, 1090-1092 (9th Cir. 1999), cert. denied, 529 U.S. 1098 (2000); Press v. Lucky Stores, Inc., 34 Cal. 3d 311, 316, 318 (1983); Bank of Stockton v. Church of Soldiers of the Cross of Christ of the State of Cal., 44 Cal. App. 4th 1623, 1630-1631 (1996).

certain private property that is broader than the limited art. 9 right to solicit nominating signatures that we have recognized thus far.  See Fashion Valley Mall, LLC v. National Labor Relations Bd., 42 Cal. 4th 850, 869-870 (2007), citing Cal. Const., art. I, § 2.  Although the California Supreme Court has identified the State's constitutional provision addressing the right to petition the government as an additional ground for protecting the solicitation of petition signatures on certain private property, see Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 910 (1979), aff'd, PruneYard, supra, citing Cal. Const., art. I, §§ 2, 3, the California courts have not interpreted this provision as extending the right to solicit signatures beyond the protection afforded by California's free speech clause.  See Albertson's, Inc. v. Young, 107 Cal. App. 4th 106, 122 (2003) ("To establish a right to solicit signatures at the entrance to a specific store, it must be shown that the particular location is impressed with the character of a traditional public forum for purposes of free speech"); Westside Sane/Freeze v. Ernest W. Hahn, Inc., 224 Cal. App. 3d 546, 554 (1990) (California's free speech clause provides "primary source" for right to solicit signatures identified in Robins v. Pruneyard Shopping Ctr., supra).  Accordingly, recognition by the California courts of an individual's right to solicit signatures on private property would open the property to a host of "other forms of expressive

activity" and thereby impose a greater burden on the property owner than we so far have recognized under the Massachusetts Declaration of Rights. See Albertson's, Inc. v. Young, supra at 128-129.

Furthermore, in concluding that the balance of interests weighs in favor of the supermarket owner, the California cases rely on the fact that such an owner has invited the public only to pass through the area outside the store's entrance, not to congregate there. See Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8, 55 Cal. 4th 1083, 1092-1093 (2012), cert. denied, 133 S. Ct. 2799 (2013); Albertson's, Inc. v. Young, 107 Cal. App. 4th at 120-122; Trader Joe's Co. v. Progressive Campaigns, Inc., 73 Cal. App. 4th 425, 433-434 (1999). For purposes of art. 9, however, this consideration carries little weight in balancing the interests presented. In Batchelder I, supra at 92, when comparing shopping malls to the "downtown" area of a municipality, we focused on the malls as an attraction for retail shopping, not on whether people congregate in particular parts of the malls. In terms of access to the public, it matters little to a signature gatherer whether people congregate in an area or merely pass through. Likewise, although signature solicitation might intrude less on a property owner's interests if the owner already permits people to congregate on the property to engage in political and expressive

activities, see id. at 93 n.12, that does not imply that such solicitation necessarily would burden the interests of any other property owner.  As discussed, nothing in the record suggests that unobtrusive signature solicitation, subject to such reasonable restrictions as Roche Bros. may prescribe, would impair Roche Bros.' commercial interests.

We conclude that Glovsky plausibly has alleged a right under art. 9 to solicit nominating signatures on the private property outside Roche Bros.' Westwood supermarket.  We now turn to whether Glovsky may seek relief under the Massachusetts Civil Rights Act for Roche Bros.' alleged violation of this right.

c.  Massachusetts Civil Rights Act.  "Not every violation of law is a violation of the [Massachusetts Civil Rights Act]." Brunelle v. Lynn Pub. Sch., 433 Mass. 179, 182 (2001), quoting Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989).  To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion."  Currier v. National Bd. of Med. Examiners, 462 Mass. 1, 12 (2012).  See G. L. c. 12, § 11I; G. L. c. 12, § 11H.  The Legislature "explicitly limited the [act's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion" in order to

prevent it from establishing a "vast constitutional tort."[13] Currier v. National Bd. of Med. Examiners, supra, quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 645, 646 (2003). See Bally v. Northeastern Univ., 403 Mass. 713, 718 (1989).

For purposes of the act, we define "threats, intimidation or coercion" as follows: a "threat" consists of "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" involves "putting in fear for the purpose of compelling or deterring conduct"; and "coercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Haufler v. Zotos, 446 Mass. 489, 505 (2006), quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994), and Buster v. George W. Moore, Inc., 438 Mass. at 646. We employ a reasonable person standard in determining whether a defendant's conduct constitutes such threats, intimidation, or coercion. Haufler v. Zotos, supra. A claim under the act is properly dismissed where the allegations in the plaintiff's complaint fail to satisfy this standard. See, e.g., Brum v. Dartmouth, 428 Mass. 684, 708

---

[13] Because she concluded that Glovsky had no right under art. 9 to solicit nominating signatures on Roche Bros.' property, the judge did not address whether Roche Bros. violated this right "by threats, intimidation or coercion." Nevertheless, both parties have briefed this issue on appeal.

(1999).

Glovsky argues that Roche Bros. interfered with his art. 9 right "by threats, intimidation or coercion" when Visconti, Roche Bros.' store manager, informed him that Roche Bros. had adopted a policy against signature solicitation, causing Glovsky to feel "intimidated" and "threatened" such that he vacated the premises.  Glovsky relies on Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985) (Batchelder II), where we held that a mall security officer's order that the plaintiff stop soliciting signatures involved sufficient intimidation or coercion to support a claim under the act.

Batchelder II, supra at 823, however, turned on the threat of immediate arrest or forcible ejection implicit within an "order[]" from a "uniformed security officer."  See Longval v. Commissioner of Correction, 404 Mass. at 333; Bally v. Northeastern Univ., 403 Mass. at 719.  See also Brunelle v. Lynn Pub. Sch., 433 Mass. at 184, quoting Reproductive Rights Network v. President of Univ. of Mass., 45 Mass. App. Ct. 495, 508 (1998) (distinguishing Batchelder II based on security officer's "heavy-handed use of police power").  Glovsky does not allege that Visconti threatened physically to remove him from the premises or to have him arrested, contrast Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86, 92 (1999), and as a private citizen without any apparent police power, Visconti's

statement that Roche Bros. prohibits signature solicitation on its property does not bear the same coercive force as a similar statement from a security officer.  See Kennie v. Natural Resource Dep't of Dennis, 451 Mass. 754, 763-765 (2008); Brunelle v. Lynn Pub. Sch., supra.[14]

Glovsky contends that Visconti's statement carried an implicit threat of arrest pursuant to G. L. c. 266, § 120, which provides:  "Whoever, without right enters or remains in or upon the . . . improved or enclosed land . . . of another . . . after having been forbidden so to do by the person who has lawful control of said premises . . . may be arrested by a sheriff, deputy sheriff, constable or police officer."  Without further indication, however, that Visconti would seek Glovsky's arrest, or cause him to suffer other serious adverse consequences, his mere declaration of Roche Bros.' policy against signature solicitation does not rise to the level of threats, intimidation, or coercion.  See Kennie v. Natural Resource Dep't of Dennis, 451 Mass. at 765, quoting Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 761 (2002) (Rapoza, J., dissenting) (limited "verbal 'posturing' and '[h]uffing and puffing'" do not

---

[14] We need not here decide whether to revisit the conclusion in Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985), that the mere notification from a security officer of the property owners' good faith policy against signature solicitation qualifies as intimidating or coercive under the Massachusetts Civil Rights Act.

constitute threats, intimidation, or coercion where such statements are both delivered by private party and unaccompanied by further actions); Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. at 476 n.9 (lecturing, counseling, and picketing against abortion do not interfere with that right through threats, intimidation, or coercion); Rodriques v. Furtado, 410 Mass. 878, 881, 889 (1991) (hospital agent's explanation to doctor of hospital's policies, leading doctor to violate plaintiff's rights in accordance with those policies, did not establish hospital's interference with plaintiff's rights by threats, intimidation, or coercion).  See also Chao v. Ballista, 772 F. Supp. 2d 337, 360 (D. Mass. 2011) (knowledge of defendant's troublesome policy does not constitute "indirect threat" amounting to threats, intimidation, or coercion); Walsh v. Lakeville, 431 F. Supp. 2d 134, 150 (D. Mass. 2006) ("[m]erely recommending" interference with right "doesn't evince the requisite threats, intimidation or coercion").  That Glovsky subjectively may have felt "threatened" or "intimidated" does not suffice.  See Meuser v. Federal Express Corp., 564 F.3d 507, 520 (1st Cir. 2009); Planned Parenthood League of Mass., Inc. v. Blake, supra at 474-475, quoting Commonwealth v. DeVincent, 358 Mass. 592, 595 (1971).  Accordingly, Glovsky's civil rights claim properly was dismissed.[15]

---

[15] This conclusion ordinarily would not preclude Glovsky

Conclusion.  That portion of the judgment dismissing Glovsky's request for declaratory relief under art. 9 is vacated and set aside.  The remainder of the judgment is affirmed.  The matter is remanded to the Superior Court for entry of a judgment dismissing the request for declaratory relief as moot.

So ordered.

---

from seeking declaratory relief under art. 9.  See Batchelder I, supra at 84 n.2.  See also Longval v. Commissioner of Correction, 404 Mass. 325, 332-333 (1989).  However, as the deadline for collecting nominating signatures and the election for which Glovsky sought ballot access have both passed, the case is now moot, and we therefore do not remand for further proceedings.  See Commonwealth v. Hanson H., 464 Mass. 807, 817 (2013); Tsongas v. Secretary of the Commonwealth, 362 Mass. 708, 720-721 (1972).

CORDY, J. (dissenting).  The court in this case significantly expands the scope of the right afforded by art. 9 of the Massachusetts Declaration of Rights at the expense of the rights of countless commercial property owners across the Commonwealth.  In so doing, its reasoning departs not only from the cautious analysis employed in Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83 (1983) (Batchelder I), but also from the overwhelming national consensus on the proper balancing of rights where a limited right to solicit signatures on private property is recognized.  By failing to recognize the enormous differences between large shopping complexes that duplicate traditional downtown functions and free-standing stores selling multiple products, the court completely undoes the intended balance between the rights of property owners and the rights of those whom they invite to use their property, and creates serious consequences for property owners who miscalculate their obligations despite their best intentions.  For these reasons, I respectfully dissent.

Roche Bros. Supermarkets, Inc. (Roche Bros.), advocates for a functional equivalence test that is supported by Batchelder I and by the decisional law of other jurisdictions that have grappled with this issue.  This test would provide clearer guidance to property owners and individuals and would achieve an

appropriate balancing of interests.[1]  Under the functional

equivalence test, where private property intentionally fills

"the societal role of a town center" such that it is the

functional equivalent of a traditional downtown district,

private property rights must yield to an individual's exercise

of his or her art. 9 right, subject to reasonable time, place,

and manner restrictions.  See Albertson's Inc. v. Young, 107

Cal. App. 4th 106, 115 (2003), citing Robins v. Pruneyard

Shopping Ctr., 23 Cal. 3d 899 (1979), aff'd, PruneYard Shopping

Ctr. v. Robins, 447 U.S. 74 (1980).  The primary consideration

in this test is the intended use, design, and character of the

property and its common areas in relation to the life of the

community, reflected largely in the nature of the invitation

extended to the public.  Where a property owner invites the

public for nearly limitless use, and thereby replicates the

environment and function of a downtown district in facilitating

mixed commercial and social endeavors, the balance of rights

tips in favor of the individual seeking to exercise rights

---

[1] That some jurisdictions employ this functional equivalence test to determine whether the conduct of a private property owner constitutes State action for the purposes of a constitutional rights analysis is not problematic.  See ante at   .  Where we are concerned with private property owners who lure the public from downtown areas by providing a full and nearly identical spectrum of services and resources without providing the individual rights typically afforded in public spaces, the analytical framework employed to determine when a private actor is behaving like a State actor is particularly fitting.

guaranteed in such public forums.  See Marsh v. Alabama, 326 U.S. 501, 506 (1946) ("The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it").  The inverse is that where a property owner invites the public for a more limited use, reflected in a utilitarian design facilitating only the specific commercial purpose of the invitation, the balance tips in favor of the owner, as the limited invitation results in the retention of some of the property's private nature.  See Lloyd Corp. v. Tanner, 407 U.S. 551, 569 (1972) ("property [does not] lose its private character merely because the public is generally invited to use it for designated purposes").

The functional equivalence test finds support in Batchelder I and in the analyses employed by other courts on this issue. Batchelder I involved the then largest shopping mall in Massachusetts, which included ninety-five separate retail stores, a movie theater, a bowling alley, an exercise facility, a beauty salon, a religious facility, and common areas that, as a practical matter, were dedicated to the public.  See Batchelder I, 388 Mass. at 85, 86 & n.4, 92-93 & n.12.  The court concluded that where the mall offered such a breadth of potential uses of the property to the public, it functioned as the equivalent of a downtown area, intentionally recreating the

traditional downtown district.  Consequently, the mall owners could not deny visitors the right to solicit signatures that they would otherwise enjoy in equivalent public spaces.  See id. at 92-93.

The United States Supreme Court and the California appellate courts, on whose decisions this court relied in Batchelder I, 388 Mass. at 87-88, 90-91, have similarly affirmed a limited right to engage in signature solicitation or speech-related rights on private property that holds itself out to the public for nearly unlimited use consistent with the function of a downtown district.[2]  See PruneYard, 447 U.S. at 78-79, aff'g

_____

[2] The court rejects Roche Bros.' reliance on California decisional law as a guidepost for the legal analysis here because the right to solicit signatures there is based in the right to free speech, which confers along with it a host of other rights.  See ante at    .  The court notes that because the art. 9 right is less intrusive in its exercise and less broad in scope, it should extend to more areas than the free speech right.  See ante at    .  I am not convinced that the balancing must be conducted any differently, or that the result cannot be instructive, where the factual scenarios and the ultimate "speech" sought are so similar to those of the case at hand.  There is no reason why the basis of the right should preclude our comparison where the ultimate right sought, the right to solicit signatures, is the same.  Further, Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83, 87-88, 90-91 (1983) (Batchelder I), and cases cited, clearly relied on California and United States Supreme Court precedent in articulating the analytical framework for the art. 9 right.  Despite emphasizing the unique need for personal contact in soliciting signatures and the narrow scope of the right as compared to free speech rights more generally, see Batchelder I, supra at 91-92, the Batchelder I court indicated no substantive difference based on the origin of the right meriting a different analytical framework.  Accordingly, I consider the decisional law of

Robins, 23 Cal. 3d at 910-911 (State constitutional free speech right can be extended to large shopping center); Marsh, 326 U.S. at 502-503, 509 (business district of town wholly owned by private corporation, which contained residences, streets, sewers, and business block with shopping center, was so broadly open for public use that private property owners' right to limit use must yield to right to distribute religious literature that would be otherwise available on public property); Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8, 55 Cal. 4th 1083, 1104 (2012), cert. denied, 133 S. Ct. 2799 (2013); Albertson's Inc., 107 Cal. App. 4th at 110, 118-119, and cases cited. See also Hudgens v. National Labor Relations Bd., 424 U.S. 507, 518 (1976) (free speech right under First Amendment to United States Constitution does not extend to private property), overruling Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 318 (1968) (large shopping center containing roads and sidewalks was functional equivalent of downtown business district and therefore certain First Amendment rights could not be infringed there).

Other States that use a multifactorial balancing test akin to the court's interpretation of Batchelder I also place significant emphasis on the nature of the invitation extended to

California and other States that have similarly rooted their right to solicit signatures in their State constitutional free speech provisions to be more persuasive than not.

the public.  See, e.g., <u>Bock</u> v. <u>Westminster Mall Co</u>., 819 P.2d 55, 61, 62 (Colo. 1991) (assessing whether common areas of mall "effectively function as a public place" or "equivalent of a downtown business district"); <u>New Jersey Coalition Against War in the Middle East</u> v. <u>J.M.B. Realty Corp</u>., 138 N.J. 326, 333, 362 (1994), cert. denied sub nom. <u>Short Hills Assocs</u>. v. <u>New Jersey Coalition Against War in the Middle East</u>, 516 U.S. 812 (1995), citing <u>State</u> v. <u>Schmid</u>, 84 N.J. 535, 563 (1980) (assessing "normal use of the property, the extent and nature of the public's invitation to use it, and the purpose of the expressional activity in relation to both its private and public use"); <u>Waremart, Inc</u>. v. <u>Progressive Campaigns, Inc</u>., 139 Wash. 2d 623, 629, 631, 636 (1999) (assessing whether store is functional equivalent of downtown area and considering, among several factors, scope of invitation to public and intent of property owner, as well as nature and use of property and of right sought to be exercised).  The functional equivalence test therefore has support both in our own precedent and that of other jurisdictions.

Applying this test, it is clear that there is a meaningful difference between large shopping malls, which consistently have been deemed places where a solicitation right may not be infringed, and free-standing supermarkets, which consistently have been deemed places where such rights are not protected.

A large shopping mall like the one at issue in <u>Batchelder I</u> can span over eighty acres, typically serving hundreds of thousands of visitors a week, and containing a wide variety of retail and department stores, commercial establishments, and many other services and amenities.  See <u>Batchelder I</u>, 388 Mass. at 85.  See also <u>Bock</u>, 819 P.2d at 62; <u>J.M.B. Realty Corp</u>., 138 N.J. at 338, 339.  Connecting these establishments within the mall are common areas that contain seating, plazas, amenities, and spaces where visitors can gather.  See <u>Van</u> v. <u>Target Corp</u>., 155 Cal. App. 4th 1375, 1388-1389 (2007); <u>J.M.B. Realty Corp</u>., <u>supra</u> at 339.  The common areas "produc[e] a congenial environment that encourages passing shoppers to stop and linger, [and] to leisurely congregate for purposes of relaxation and conversation."  <u>Ralphs Grocery Co</u>., 55 Cal. 4th at 1092; <u>Bock</u>, <u>supra</u> (visitors "engage, no doubt, in conversations on all subjects" in common areas of mall).  In these common areas, the mall provides regular programming and events, some "charitable and civic" and meant to connect the community, others "simply entertainment," <u>Batchelder I</u>, <u>supra</u> at 86 & n.4, that draw visitors who may or may not plan to shop.  See <u>J.M.B. Realty Corp</u>., <u>supra</u> at 334, 358.  See also <u>Waremart</u>, 139 Wash. 2d at 636-637 (malls often have walking groups, choir meetings, and other activities).

Although its primary purpose, as with any commercial

endeavor, is to make a profit, the mall promotes itself as a place where all members of the community can engage in any number of activities, thereby blurring the line between commercial, civic, and expressive endeavors.[3] The resulting invitation to the public to use the mall is all-inclusive: to shop, to be entertained, to attend to personal or health needs, to congregate, to learn, to connect with others, and to do all the activities one could do in a downtown area. See Robins, 23 Cal. 3d at 910-911; J.M.B. Realty Corp., supra at 333-334, 359.

In so opening the property to a nearly limitless range of uses, the mall situates itself as the functional equivalent of and substitute for the downtown district, where historically communities have gathered for such mixed purposes.[4] See Ralphs

---

[3] As the Supreme Court of New Jersey observed, "The hope is that once there they will spend. The certainty is that if they are not there they will not." New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 358 (1994), cert. denied sub nom. Short Hills Assoc. v. New Jersey Coalition Against War in the Middle East, 516 U.S. 812 (1995).

[4] A mall need not be enclosed to serve this purpose, and indeed, current commercial developments employ an outdoor shopping concept that even more closely resembles the historic Main Street. As but two examples, the recently developed The Street in Chestnut Hill and Legacy Place in Dedham are both designed with the clear intention of replicating Main Street. The Street blurs the line between commercial and noncommercial purposes by offering a wide range of high-end retail stores intermixed with restaurants, a medical center, a movie theater, a bank, an optician, hair salons, a large supermarket, a fitness facility, and common areas for rest and relaxation. It encourages visitors to bring their pets and hosts a variety of concerts, yoga classes, and other activities with no purchase

Grocery Co., 55 Cal. 4th at 1091, quoting Robins, 23 Cal. 3d at 907, 910; J.M.B. Realty Corp., 138 N.J. at 333-334, 357, 359. As a result, because the mall intentionally replaces Main Street, it is appropriate for community members to enjoy at least some of the expressive rights that they otherwise would be able to exercise on the traditional Main Street.

Indeed, "every state that has found certain of its constitutional free-speech-related provisions effective regardless of 'state action' has ruled that shopping center owners cannot prohibit that free speech" (emphasis in original). J.M.B. Realty Corp., 138 N.J. at 352, 360. See, e.g., Batchelder I, 388 Mass. at 92-93; Robins, 23 Cal. 3d at 905-906; Bock, 819 P.2d at 62 ("Mall functions as the equivalent of a downtown business district" because contains wide variety of commercial and retail establishments, permits range of activities in common areas, and facilitates public gathering and discussion by opening common areas for varied use); Alderwood Assocs. v. Washington Envtl. Council, 96 Wash. 2d 230, 246 (1981) (large regional shopping center "performs a traditional public function by providing the functional equivalent of a town center or community business block").

In stark contrast, a free-standing supermarket like Roche

_____

required.  Similarly, Legacy Place offers extensive retail, food, and entertainment options, and a wide variety of children's workshops and free concerts.

Bros., no matter how large, does not replicate a downtown area on these measures.  A supermarket occupies significantly less acreage, here just under five acres, and may contain a handful of ancillary businesses, such as the full-service bank that leases a small portion of the space inside the Roche Bros. store here.  Although the complaint does not allege additional facts,[5] the store may have a few chairs inside and a few benches along the sidewalk near a single entrance and exit.  But there is no allegation that the entryway where the plaintiff sought to solicit signatures serves any more than the limited purpose of facilitating the entrance and exit of shoppers.  Cf. Ralphs Grocery Co., 55 Cal. 4th at 1092 ("areas immediately adjacent to the entrances of individual stores typically lack seating and are not designed to promote relaxation and socializing," but rather "serve utilitarian purposes of facilitating customers' entrance to and exit from the stores and also, from the store's perspective, advertising the goods and services available within").  This limited purpose is meaningfully different from the vast invitation of the open spaces intentionally provided in large shopping malls.  Absent common areas, advertised

---

[5] There is no indication on the record before us of how many visitors the supermarket receives each week, what its gross annual or weekly sales are, whether the supermarket offers any programming or social events, or whether there are any common areas in the store.

programming, or a host of unrelated amenities designed to encourage visitors to pursue varied needs, the invitation Roche Bros. extends to the public for use of its property is a far more limited one than that of a large mall: to purchase the goods and services Roche Bros. offers.[6] See Costco Cos. v. Gallant, 96 Cal. App. 4th 740, 755 (2002). All of the areas and features of the store are designed toward this purpose. There is no general invitation to gather or to come to the store for some other purpose; there is only the invitation to shop and to utilize the ancillary services provided in furtherance of this invitation. See Albertson's Inc., 107 Cal. App. 4th at 120-121. See also Lloyd Corp., 407 U.S. at 569.

I am very troubled by the court's suggestion that the variety of the items sold by Roche Bros. is particularly relevant to the analysis. See ante at  . This is a matter of convenience and not of constitutional importance. The court

---

[6] Even if Roche Bros. were to provide other amenities not specifically identified in the complaint, they most likely would be in furtherance of its explicit commercial purpose of inviting the public to shop there. A pharmacy, a movie rental facility, photograph printing services, a United States mail box, lottery ticket sales, small children's rides outside the entrance, public payphones, or any number of other, small-scale services are all amenities of convenience, ancillary to the primary purpose of shopping for groceries and other household items. They render it more likely that a customer will choose to shop for groceries at this store instead of another option; they do not signal to the public that they should come to the store to engage in noncommercial activities. See Fred Meyer Stores, Inc. v. Garrett, 191 Or. App. 582, 585-586 (2004).

allows itself to be distracted by the plaintiff's argument that because the supermarket offers products that in a bygone era would require visits to numerous stores, the supermarket must be considered a wholesale replica of a downtown shopping district. This argument shifts the inquiry from the design and purposeful use of the property to the inventory of the particular store, which may change with the seasons, global product availability, business priorities, consumer demand, or any number of variables irrelevant to the constitutional analysis we are conducting here. It diminishes the weight of other more important considerations by focusing on an individual store owner's business acumen in determining that a customer might like to buy aspirin and tissues along with orange juice. Were inventory determinative, every general store in the Commonwealth that is not accessible by a public walkway, from the shoeshine-cum-sundries shops nestled within the corporate towers of downtown Boston to the pharmacies and big-box stores which now dot our urban and suburban environment, might be found to have surrendered their property rights to those of individual citizens, with no further inquiry into whether these stores truly function as the equivalent to downtown districts.[7]

---

[7] Although the court assures us that its holding does not extend to "small-scale general stores," see ante at    , it provides no further guidance as to where exactly it would draw the line.

It cannot be that a single store, designed to invite customers for a limited commercial purpose, falls into the same class as a large shopping mall simply because it carries a varied inventory.[8]  This convenience factor does not import the social and gathering functions that result from the intentional design and use of a property's common areas to facilitate community congregation, nor does it transform the invitation from a specific commercial one (fulfil all of your daily shopping needs here) to an all-inclusive one (do whatever you would like here).  See Trader Joe's Co. v. Progressive Campaigns, Inc., 73 Cal. App. 4th 425, 433 (1999).

Rather, supermarkets that lack common spaces designed to facilitate congregation and encourage visitors with varied agendas fail to replicate the historic downtown district.  For this reason, other States have explicitly rejected the analogy of a single store or supermarket, even where situated among a few other stores, to a downtown district or to a large shopping mall, and accordingly they have declined to extend certain individual liberties to such private property.  See Ralphs

---

[8] There is a key distinction between the inventory of a single store and the over-all collection assembled within a large shopping mall.  A large mall intentionally brings together numerous tenants to cater to a range of different types of customers.  In so doing, it creates common spaces between these stores that then serve as points of congregation and replicate a downtown area.

Grocery Co., 55 Cal. 4th at 1093, 1104 (entryway to supermarket not public forum because not "designed and furnished in a way that induces shoppers to congregate," but rather "to walk to or from a parking area"); Van, 155 Cal. App. 4th at 1388-1389 (entrances to Target, Wal-Mart, and Home Depot stores not "functional equivalent of a traditional public forum" because "designed to encourage shopping as opposed to meeting friends, congregating or lingering," and did not contain "courtyards, plazas or other places designated to encourage patrons to spend time together or be entertained"); Albertson's Inc., 107 Cal. App. 4th at 120-121 (supermarket not "functional equivalent of traditional public forum" because "does not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises," and its entrance is not "place where people choose to come and meet and talk"); Costco Cos., 96 Cal. App. 4th at 755 (Costco stores not "miniature downtowns" because customers go to stores "to purchase . . . goods and services offered by Costco," not "with the expectation they will meet friends, be entertained, dine or congregate"); People v. DiGuida, 152 Ill. 2d 104, 126-127 (1992) (free-standing grocery store does not "present[ ] itself as a forum for free expression" because does not give "impression that its property was public in nature and open to expressive activities"); J.M.B. Realty Corp., 138 N.J. at 373 ("No highway strip mall . . . no

single huge suburban store, no stand-alone use, and no small to medium shopping center sufficiently satisfies the standard . . . to warrant the constitutional extension of free speech to those premises"); Fred Meyer Stores, Inc. v. Garrett, 191 Or. App. 582, 585-586 (2004) (no right to solicit petition signatures at supermarket marketing itself as one-stop shop and offering mailboxes, automated teller machines, public telephones, and seating areas because invitation to public not sufficiently broad); Waremart, 139 Wash. 2d at 636-637 (no right to petition or solicit signatures at retail grocery store that invites public for limited commercial purposes and not "for any noncommercial purpose," because store does not "promote any public services on their locations," does not have "areas for citizens to congregate[,] . . . wait or converse," and "bear[s] none of the characteristics of a town center" [citations omitted]).  See also Lloyd Corp., 407 U.S. at 569 ("Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there").  This court, however, has chosen to ignore this consensus and the predictable reasoning underlying it.

Even under the Batchelder I balancing test as the court interprets it, which entails more interest-based rather than size, scope, and functional considerations, the balance to be

struck for a supermarket like Roche Bros. should not lean in favor of art. 9 rights. I need not discuss the individual interests of using a local grocery store as a place for the solicitation of signatures -- that much is clear from the court's opinion, and I do not dispute the importance of this interest. But the court undervalues Roche Bros.' claims of perceived indorsement and interference with its commercial enterprise and its own constitutional property and speech rights, such that the court miscalculates the interests at stake.

Where a retail business stands alone in its physical space, unaccompanied by other stores, there is a real risk that it will be seen as indorsing a candidate for whom signatures are being solicited outside its entrance. In addition, where there is only one entrance, and the supposed "common area" of the property consists of the walkway to that entrance, other customers will be unable to avoid the solicitations as they enter and leave the store.[9] As the California Supreme Court has observed, "[s]oliciting signatures . . . pose[s] a significantly greater risk of interfering with normal business operations when those activities are conducted in close proximity to the entrances and exits of individual stores rather than in the less

---

[9] This is indeed what makes the location so appealing to those seeking signatures.

heavily trafficked and more congenial common areas."[10]  Ralphs

Grocery Co., 55 Cal. 4th at 1092.  Cf. J.M.B. Realty Corp., 138

N.J. at 374 (where property stands alone, "exercise of free

speech will generate greater interference with their normal

use").  The right to solicit signatures cannot truly be

exercised "unobtrusive[ly]" when it is done so directly in front

of the only ingress and egress of a free-standing store.  See

Batchelder I, 388 Mass. at 92.  Although the art. 9 right, as

has been noted, is narrower than the right to free speech, a

single, free-standing store may nonetheless suffer an impact or

interference from its exercise, particularly if it serves to

stifle the property owner's exercise of its own property or

speech rights.

The solutions the court proposes for overcoming perceived

indorsement and commercial interference do not cure these

concerns.  See ante at    .  There are numerous reasons why

---

[10] In contrast, perceived indorsement concerns are minimal
if not nonexistent at large shopping malls with hundreds of
tenants.  Where many malls carry a name that is localized (e.g.,
Northshore Mall, Natick Mall) or catchy (e.g., Assembly Row,
Legacy Place), only the most informed visitor would know the
identity of the mall's owner.  Further, because large malls
contain "numerous separate business establishments" and numerous
entrances, it is unlikely that permitting the solicitation of
signatures would impair the value or use of the property as a
mall or interfere with normal business operations.  See
PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 83 (1980);
Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 910-911
(1979).

posting disclaimers would be impracticable or undesirable for property owners, and time, place, and manner restrictions can go only so far in countering perceived indorsement and interference while still being minimal and reasonable limitations on the solicitation right.  Cf. PruneYard, 447 U.S. at 96 (Powell, J., concurring in part and in the judgment) ("Even large establishments may be able to [demonstrate] . . . substantial annoyance to customers" of exercise of free speech right "that could be eliminated only by elaborate, expensive, and possibly unenforceable time, place, and manner restrictions").  These important considerations as to the burden on the owner of property occupied by a stand-alone store have led courts in other States employing nearly identical balancing tests to find the balance tipped decidedly in favor of the owner's rights.

The consequences of today's decision are significant.  Aside from swinging the pendulum too far in favor of the exercise of individual rights at the expense of those of property owners, the court's decision offers an unworkable test in several respects.  No retail store except the smallest, most highly specialized one can safely determine that it falls outside the scope of the art. 9 right.  All other property owners must interpret the sweeping strokes and muddied reasoning of the court's decision to parse whether they are obligated to respect an individual's exercise of the art. 9 right in any

common or outdoor areas, even when that exercise interferes with their own constitutional rights or with the livelihood of their commercial enterprise, and even when, under an appropriate analysis, their rights as property owners would rightfully trump those of their visitors.  To preserve their independence from perceived indorsement and to ensure a safe and easy shopping experience for other customers, property owners will need to craft careful time, place, and manner restrictions that minimize interference.  See Batchelder I, 388 Mass. at 92-93.

In addition, in determining whether they must permit solicitation activity and the extent to which they may restrict such activity, property owners will be inclined to err on the side of caution where the court creates today the likelihood that, if the business makes the incorrect calculation, it will owe compensatory money damages under the Massachusetts Civil Rights Act (act) to the aggrieved individual.  See G. L. c. 12, § 11I.  It is worth repeating that we have consistently avoided reading the act as creating a "vast constitutional tort" by recognizing actionable conduct in only very limited circumstances.  Bally v. Northeastern Univ., 403 Mass. 713, 718 (1989), quoting Bell v. Mazza, 394 Mass. 176, 182 (1985).  See Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 564, 565-566, cert. denied, 516 U.S. 931 (1995).  But the court's

decision opens the door for a host of claims under the act where they are unwarranted.

In vastly expanding the realm of private properties on which the art. 9 right may be exercised, and in interpreting the requirements for a successful claim under the Massachusetts Civil Rights Act in this way, the court creates a burdensome and unnavigable standard for property owners.  This holding goes too far in eroding the rights of property owners to use their property for commercial endeavors without undue interference.  Because I believe that the exercise of the art. 9 right on private property should be limited to properties that serve as the functional equivalent of a traditional downtown area, and that the Roche Bros. supermarket at issue here does not so serve, I would affirm the grant of Roche Bros.' motion to dismiss on all grounds.